## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JONATHAN DIMAIO,
    c/o Arnold & Porter Kaye Scholer LLP
    601 Massachusetts Ave. NW
    Washington, DC 20001,

CORY FOX,
    c/o Arnold & Porter Kaye Scholer LLP
    601 Massachusetts Ave. NW
    Washington, DC 20001,


and JOCARDO RALSTON,
    c/o Arnold & Porter Kaye Scholer LLP
    601 Massachusetts Ave. NW
    Washington, DC 20001,

          *Plaintiffs*,

        v.

CHAD WOLF, in his official capacity as Acting Secretary
of Homeland Security,
    245 Murray Lane SW
    Washington, DC 20528,

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY,
    245 Murray Lane SW
    Washington, DC 20528

MARK A. MORGAN, in his official capacity as Acting
Commissioner of United States Customs and Border
Protection,
    1300 Pennsylvania Ave. NW
    Washington, DC 20229

and UNITED STATES CUSTOMS AND BORDER
PROTECTION,
    1300 Pennsylvania Ave. NW
    Washington, DC 20229

          *Defendants*.

Case No.  1:20-cv-00445

**COMPLAINT FOR VACATUR OF UNLAWFUL AGENCY RULE
AND DECLARATORY AND INJUNCTIVE RELIEF**

1.      This is an action pursuant to the Administrative Procedure Act challenging a U.S. Department of Homeland Security rule issued on February 5, 2020 that makes residents of the State of New York ineligible to enroll or re-enroll in CBP's Trusted Traveler Programs, including the Global Entry program.

2.      Global Entry is a program administered by U.S. Customs and Border Protection that allows pre-approved, low-risk travelers to receive expedited security clearance at over 70 airports worldwide.  The statute authorizing Global Entry directs CBP to establish the program and eligibility criteria by "rulemaking" and to take steps to "ensure that the [] program includes as many participants as practicable."  8 U.S.C. § 1365b(k)(3)(C), (E).

3.      Following the statutory directives, CBP engaged in notice-and-comment rulemaking and issued the final regulations governing Global Entry in February 2012.  8 C.F.R. § 235.12.  The regulations, duly published in the Federal Register, permit qualifying U.S. citizens, nationals, and lawful permanent residents, as well as certain individuals from other countries, to apply for and enroll in Global Entry.  Today, more than 5 million people are enrolled in Global Entry and approximately 50,000 new applications for the program are filed monthly.

4.      On February 5, 2020, the Acting Secretary of Homeland Security sent notice—not through the Federal Register but rather "[v]ia email and U.S. mail"—to two officials in the New York State Department of Motor Vehicles that, effective "immediately," "New York residents will no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs."

5.      The Acting Secretary's letter deprives the roughly 20 million residents of the State of New York of the ability to apply for or renew their participation in Global Entry and

other Trusted Traveler programs.  It immediately impacts the roughly 80,000 residents of the

State who have applications pending for Trusted Traveler programs like Global Entry.  And it

will prevent an additional 175,000 residents from re-enrolling in Global Entry when their

memberships expire.

6.     The Acting Secretary's letter is a substantive rule under the APA.  A rule is

defined by the APA as *any* "agency statement of general or particular applicability and future

effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  A rule is

"substantive" if it grants rights, imposes obligations, or produces other significant effects on

private interests, or if it effects a change in existing law or policy.  *Am. Tort Reform Ass'n v.*

*Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013).  The Acting

Secretary's letter dramatically alters the existing eligibility criteria for Global Entry by barring

every resident of the State of New York from applying to the program.

7.     Before a substantive rule may issue, the APA requires a notice of proposed

rulemaking to be published in the Federal Register.  5 U.S.C. § 553(b).  That notice must

disclose—among other things—"the legal authority under which the rule is proposed," *id.*, and it

must "give interested persons an opportunity to participate in the rule making" by submitting

written comments, *id.* § 553(c).

8.     The Acting Secretary's rule did not comply with the APA's mandatory notice-

and-comment procedures.  The rule was not published in the Federal Register, did not disclose

the legal authority for the rule, and did not give interested parties an opportunity to comment.

The Acting Secretary did not invoke any of the exceptions to the APA's rulemaking procedures,

nor would they apply here even if he had.  *See* 5 U.S.C. § 553(b)(B).  The Acting Secretary also

failed to provide the mandatory 30-day delay in a rule's effective date to permit affected parties

to prepare for the rule before it takes effect.  *Id.* § 553(d).  The Acting Secretary's rule must therefore be vacated, as it was promulgated "without observance of procedure required by law." *Id.* § 706(2)(D).

9.      The APA also protects the public against Executive action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Acting Secretary's rule is just that.  The rule categorically bars millions of New Yorkers from participating in Global Entry, notwithstanding Congress's instruction to "ensure" that the program "includes as many participants as practicable."  8 U.S.C. § 1365b(k)(2), (3).  The nominal reason for the change—that New York will no longer provide DHS access to certain DMV records—is inadequately explained and, in any event, utterly arbitrary.  The rule makes no attempt to explain why DHS requires access to these records in order to administer the Global Entry program.  All existing evidence points to the contrary.  For example, New York residents *without* New York-issued licenses (a group comprising nearly half the state) have long been eligible to participate in the program, even though DHS could not obtain any relevant information about them from the DMV.

10.     The Acting Secretary's action is disturbing.  The APA's requirements are a crucial and basic check against arbitrary Executive action.  As then-Judge Kavanaugh has observed, "notice and comment" may be "burdensome," but it "serves important purposes."  *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 87-88 (D.C. Cir. 2014).  It "helps to prevent mistakes" and it "helps ensure that regulated parties receive fair treatment, a value basic to American administrative law."  *Id.*  The Acting Secretary could not lawfully issue this rule without following notice-and-comment procedures and without providing a reasonable explanation for his decision.  There is no justification for his decision to issue it anyway.

11.     The Acting Secretary's rule should be declared unlawful, vacated, and enjoined.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

13.     Defendants' issuance of the rule on February 5, 2019 constitutes a final agency action and is therefore judicially reviewable under the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities, defendants are located in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

15.     Plaintiff Jonathan DiMaio is a resident of the State of New York.  He planned to enroll in Global Entry in early 2020 but cannot under Defendants' rule.

16.     Plaintiff Cory Fox is a resident of the State of New York.  She planned to enroll in Global Entry in early 2020 but cannot under Defendants' rule.

17.     Plaintiff Jocardo Ralston is a resident of the State of New York.  He applied to Global Entry in January 2020, but his application has been canceled in light of Defendants' rule.

18.     Defendant Chad Wolf is the Acting Secretary of the Department of Homeland Security.  He is sued in his official capacity.

19.     Defendant United States Department of Homeland Security ("DHS") is an agency of the United States government, located at 245 Murray Lane SW, Washington, DC 20528. DHS is responsible for, among other things, administering the Trusted Traveler programs.

20.     Defendant Mark A. Morgan is the Acting Commissioner of U.S. Customs and Border Protection.  He is sued in his official capacity.

21.     Defendant U.S. Customs and Border Protection (CBP) is a sub-agency within DHS, located at 1300 Pennsylvania Ave. NW, Washington, DC 20229.  CBP is responsible for, among other things, administering the Trusted Traveler programs.

## BACKGROUND

### A.     The Global Entry Program

22.     Congress authorized the Global Entry program in the Intelligence Reform and Terrorism Prevention Act of 2004, 118 Stat. 3638 (hereinafter "IRTPA"), a wide-ranging statute enacted in response to the terrorist attacks of September 11th, 2001.

23.     The IRTPA instructs the Secretary of Homeland Security to "establish an international registered traveler program that incorporates available technologies … and security threat assessments to expedite the screening and processing of international travelers, including United States Citizens and residents, who enter and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).  Congress explained in its findings that the registered traveler program "should be a high priority," because "expediting known travelers … permit[s] inspectors to better focus on identifying terrorists attempting to enter the United States."  *Id.* § 1365b(k)(1)(A)-(B).

24.     The IRTPA thus directed the Secretary to "initiate a rulemaking to establish the [Global Entry] program, criteria for participation, and the fee for the program."  8 U.S.C. § 1365b(k)(3)(C).

25.     The IRTPA specifically requires the Secretary to "ensure that the [Global Entry] program includes as many participants as practicable" by "making program enrollment convenient and easily accessible" and "providing applicants with clear and consistent eligibility guidelines."  8 U.S.C. § 1365b(k)(3)(E).

26.     In April 2008, CBP announced a pilot program to implement the IRTPA's directives.  *See Announcement of Pilot Program: International Registered Traveler (IRT)*, 73 Fed. Reg. 19,861 (Apr. 11, 2008); *International Registered Traveler Pilot Program Name Changed to Global Entry*, 73 Fed. Reg. 30,416 (May 27, 2008).

27.     In November 2009, CBP initiated a rulemaking to make the Global Entry program permanent.  *See Establishment of Global Entry Program*, 74 Fed. Reg. 59,932 (Nov. 19, 2009). As required by 5 U.S.C. § 553(b) and (c), CBP explained the legal authority for the proposed rule and invited the public to participate by submitting comments and other relevant information.

28.     In February 2012, CBP published the final rule establishing the Global Entry program and promulgating regulations governing eligibility and the application process.  *See Establishment of Global Entry Program*, 77 Fed. Reg. 5,681 (Feb. 6, 2012).  CBP explained that Global Entry furthers its "strategic goal of facilitating legitimate travel while securing the homeland."  *Id.* at 5,685.

### B.     Eligibility for Global Entry

29.     Under CBP's regulations, an individual is eligible to apply for Global Entry if he (1) is a U.S. citizen, national, or lawful permanent resident; (2) holds a valid passport, permanent resident card, or other appropriate travel document; (3) has parental or guardian consent, if he is a minor; and (4) does not have any "disqualifying factors" that could render him ineligible to participate in the program.  8 C.F.R. § 235.12(b)(1).

30.     Those "disqualifying factors" are described in 8 C.F.R. § 235.12(b)(2), which provides that an individual is "ineligible to participate" in Global Entry "if CBP, at its sole discretion, determines that the individual presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low-risk traveler." *Id.* § 235.12(b)(2).  "This risk determination will be based in part upon an applicant's ability to demonstrate past compliance with laws, regulations, and policies." *Id.*

31.     The regulation then lists seven specific "[r]easons why an applicant may not qualify for participation" in the program:

    a.   (i) "[t]he applicant provides false or incomplete information on the application";

    b.   (ii) "[t]he applicant has been arrested for, or convicted of, any criminal offense or has pending criminal charges or outstanding warrants in any country";

    c.   (iii) "[t]he applicant has been found in violation of any customs, immigration, or agriculture regulations, procedures, or laws in any country";

    d.   (iv) "[t]he applicant is the subject of an investigation by any federal, state, or local law enforcement agency in any country";

    e.   (v) "[t]he applicant is inadmissible to the United States under applicable immigration laws or has, at any time, been granted a waiver of inadmissibility or parole";

    f.   (vi) "[t]he applicant is known or suspected of being or having been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism"; and

    g.   (vii) "[t]he applicant cannot satisfy CBP of his or her low-risk status or meet other program requirements." *Id.* § 235.12(b)(2)(i)-(vii).

32.     Global Entry eligibility is not limited to U.S. citizens and permanent residents;
"[c]ertain nonimmigrant aliens" are eligible to apply for Global Entry as well.  8 C.F.R.
§ 235.12(b)(2)(ii).  The regulations permit CBP to enter into agreements with foreign countries
that operate their own trusted traveler programs.  Upon reaching an agreement, CBP must
publish a notice in the Federal Register explaining its scope—*e.g.*, whether only citizens of the
foreign country are eligible to apply or whether noncitizen residents may apply as well.  *Id.*

33.     Today, citizens of the following countries are eligible to apply for Global Entry:
Argentina, Colombia, Germany, India, the Netherlands, Panama, the Republic of Korea,
Singapore, Switzerland, Taiwan, and the United Kingdom.  Mexican nationals (whether citizens
or not) are also eligible to apply, and Canadian citizens and residents are eligible for Global
Entry benefits through the NEXUS program.  CBP has generally announced these expansions via
notice in the Federal Register.[1]

**C.     Global Entry Application Process**

34.     To begin the process of applying for Global Entry, an applicant completes an
online application and pays a non-refundable fee.  8 C.F.R. § 235.12(d)(1), (2).

35.     CBP then reviews the application to determine whether the applicant meets the
eligibility requirements.  During this vetting process, a CBP officer runs the applicant's
information in several databases and completes a Risk Assessment Worksheet to evaluate the

---

[1] *See* U.S. Customs and Border Protection, *Eligibility for Global Entry*, https://bit.ly/2SFZkRH
(last visited Feb. 13, 2020); *see also Expansion of Global Entry Eligibility to Citizens of the Re-
public of Colombia, Citizens of the Republic of Singapore, and Citizens of Switzerland*, 82 Fed.
Reg. 37,892 (Aug. 14, 2017); *Expansion of Global Entry to All Citizens of the United Kingdom*,
81 Fed. Reg. 45,170 (July 12, 2016); *Expansion of Global Entry Eligibility to All Citizens of the
Federal Republic of Germany*, 71 Fed. Reg. 7,822 (Feb. 16, 2016); *Expansion of Global Entry
Eligibility to Citizens of the Republic of Panama*, 80 Fed. Reg. 1,509 (Jan. 12, 2015); *Expansion
of Global Entry Eligibility to Certain Citizens of the Republic of Korea, the Federal Republic of
Germany, the State of Qatar, and the United Kingdom*, 78 Fed. Reg. 48,706 (Aug. 9, 2013); *Ex-
pansion of Global Entry Pilot to Mexican Nationals*, 75 Fed. Reg. 82,200 (Dec. 29, 2010).

application.  Among the government databases reviewed by CBP are the National Crime

Information Center (NCIC), a criminal records clearinghouse maintained by the Federal Bureau

of Investigation (FBI).[2]  Federal, state, local, and tribal criminal justice agencies all submit

criminal records into NCIC.[3]

36.     If the application is conditionally approved, CBP contacts the applicant to

schedule an in-person interview at a Global Entry Enrollment Center.  8 C.F.R. § 235.12(e)(1).

At the interview, a CBP officer confirms the applicant's identity, validates the applicant's

passport or other qualifying travel document, takes a photograph, collects fingerprints, and

confirms that the applicant meets the eligibility criteria.

37.     At no point is a driver's license required to apply for or enroll in Global Entry.

38.     Approved applicants are accepted into Global Entry for a period of 5 years.  CBP

vets participants in the program every 24 hours, as well as every time they use a Global Entry

kiosk.  CBP may "suspend[] or remove[]" a person from the program before the end of the 5-

year period if it determines the eligibility criteria are no longer met.  8 C.F.R. § 235.12(j)(2).  A

participant is notified of his or her suspension or removal in writing.  *Id.* § 235.12(j)(3).

39.     Participants in Global Entry may apply to renew their enrollment up to one year

before their enrollment expires.  8 C.F.R. § 235.12(d)(3).

40.     If an application is denied, CBP notifies the applicant of the reasons for the

denial.  8 C.F.R. § 235.12(j)(1).  The applicant has "three possible methods for redress":

---

[2] Office of Inspector General, Dep't of Homeland Security, CBP's Global Entry Program Is Vulnerable to Exploitation 2, 27-28 (June 24, 2019) (hereinafter "OIG Report"), *available at* https://bit.ly/38nSNli.

[3] Fed. Bureau of Investigation, *National Crime Information Center*, https://bit.ly/3bzBzmV (last visited Feb. 13, 2020).

contesting the denial at an enrollment center, submitting a form through DHS's Traveler Redress Inquiry Program, or writing to the CBP Trusted Traveler Ombudsman.  *Id.* § 235.12(k).

### D.    Benefits of Global Entry

41.    Over 5.4 million people had enrolled in Global Entry by June 2018.[4]

42.    Global Entry participants enjoy expedited processing upon their arrival at participating airports in the United States.  A participant may proceed directly to an automated Global Entry kiosk, where he presents his passport or permanent resident card, verifies his fingerprints, and completes a customs declaration form.  The kiosk then issues a transaction receipt, which the participant presents to a CBP officer to exit the screening area.

43.    Today, Global Entry kiosks are available at 75 airports and preclearance locations worldwide.[5]  According to CBP, Global Entry "speeds the CBP processing time for participating air travelers by more than 70%."  77 Fed. Reg. at 5,688.  More than 75 percent of travelers using Global Entry are processed in under five minutes.[6]

44.    Applicants enrolled in Global Entry are also automatically enrolled in TSA PreCheck.  TSA PreCheck, administered by the Transportation Security Administration, allows for expedited security screening through designated lanes at U.S. airport security checkpoints.

### E.    Other Trusted Traveler Programs Operated by CBP

45.    CBP operates three additional Trusted Traveler programs, all of which "offer[] expedited processing for pre-identified, lower risk populations."  These programs, like Global

---

[4] OIG Report at 1.

[5] U.S. Customs and Border Protection, *Airports with Global Entry Kiosks*, https://bit.ly/39y6SNj (last modified Sept. 7, 2018).

[6] U.S. Customs and Border Protection, *Trusted Traveler Programs: Fact Sheet* 2 (Oct. 2015), *available at* https://bit.ly/2wgQMcD.

Entry, "provide modified screening for pre-approved members, improve security by increasing efficiencies in allocating screening resources, and facilitate legitimate trade and travel."[7]

46.     The Secure Electronic Network for Travelers Rapid Inspection (SENTRI) program allows for expedited entry at land border crossings along the U.S.-Mexico border.[8] Over 425,000 individuals are enrolled in SENTRI.

47.     The NEXUS program allows for expedited border crossing between the United States and Canada.  The program is jointly administered by CBP and the Canadian Border Services Agency (CBSA); both agencies must approve all applications and conduct ongoing vetting of NEXUS participants.  Over 1.25 million individuals are enrolled in NEXUS.[9]

48.     Finally, the Free and Secure Trade (FAST) program allows for expedited entry by known low-risk commercial carriers into the United States from Mexico or Canada.  Active commercial carriers from the United States, Canada, and Mexico are eligible to apply.  To participate in FAST, every link in the supply chain, from manufacturer to carrier to driver to importer, must be certified under the Customs-Trade Partnership Against Terrorism program. Over 75,000 drivers are currently enrolled in FAST.[10]

**F.      The February 5, 2020 Rule**

49.     On February 5, 2020, DHS banned all New York residents from enrolling or re-enrolling in Trusted Traveler programs.

50.     DHS made this determination in a letter from Acting Secretary Chad Wolf to officials with the New York State Department of Motor Vehicles ("DMV").  DHS asserted that,

---

[7] *Id.* at 1.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 2.

effective "immediately," "New York residents will no longer be eligible to enroll or re-enroll in in CBP's Trusted Traveler Programs."  *See* Ex. A at 3 ("February 5 Rule").  DHS explained that it was barring all New Yorkers from applying for Trusted Traveler programs because of a recent New York law that allows undocumented immigrants residing in New York to obtain driver's licenses.  *See* Ex. B ("New York Law" or "Law"); *see also* N.Y. Veh. & Traf. Law §§ 201, 502, 508 (2019).  The Law also generally bars federal immigration officials from accessing DMV databases without a court order.

51.     DHS reasoned that the New York Law "compromises CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements." Ex. A at 2.  DHS explained that the law "prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history."  *Id.* DHS further reasoned that "New York DMV records have long been used by ICE law enforcement personnel to verify or corroborate an investigatory target's Personally Identifiable Information (PII), which can include their residential address, date of birth, height, weight, eye color, hair color, facial photograph, license plate, and vehicle registration information."  *Id.* DHS concluded that the Law "requires DHS to take immediate action to ensure DHS's efforts to protect the Homeland are not compromised."  *Id.*

52.     The February 5 Rule does not address whether the information in New York DMV records that DHS purportedly needs is obtainable from other sources.

53.     The February 5 Rule does not address why New York residents who have recently lived in other states, and thus whose information is not within New York DMV records, are barred from enrolling or re-enrolling in Trusted Traveler programs.

54.     The February 5 Rule does not address the exceptions within the New York Law that allow federal immigration officials to access New York DMV records, and whether those exceptions are sufficient for DHS officials "to confirm whether an individual applying for TTP membership meets program eligibility requirements."  Ex. A at 2.

55.     Despite "immediately" altering the ability of millions of New York residents to apply for Trusted Traveler Programs, Ex. A at 3, the February 5 Rule was not promulgated under the notice and comment provisions of the Administrative Procedure Act.  New York residents therefore did not have the opportunity to comment on the myriad practical and logical infirmities in DHS's purported justification for the February 5 Rule.  And DHS consequently did not address these issues before ending the ability of millions of New Yorkers to apply for these programs.

## G.     The Impact of the February 5 Rule on Plaintiffs' Ability to Enroll in Global Entry

56.     Plaintiff Jonathan DiMaio is a U.S. citizen and a resident of Brooklyn, New York. He is a filmmaker.

57.     Mr. DiMaio has a valid passport and meets the eligibility criteria for Global Entry set forth in 8 C.F.R. § 235.12.

58.     Mr. DiMaio frequently travels internationally.  He has multiple international trips scheduled over the next several months, including trips to Italy in spring 2020 and to the Dominican Republic in summer 2020.

59.     Mr. DiMaio is finishing post-production of a feature film, which he will be submitting to international film festivals that will take place in 2021, and he anticipates international travel related to that process.

60.     Mr. DiMaio planned to enroll in Global Entry to make his upcoming international travel more convenient and, in particular, to reduce processing times at the airport.  As a New York resident, he is no longer eligible to apply for Global Entry under the February 5 Rule.  That is the case even though Mr. DiMaio has never had a New York-issued driver's license.

61.     Because of the February 5 Rule, Mr. DiMaio can no longer apply for Global Entry as planned.

62.     Plaintiff Cory Fox is a U.S. citizen and a resident of Brooklyn, New York.  She is a teacher at a school in New York.

63.     Ms. Fox has a valid passport and meets the eligibility criteria for Global Entry set forth in 8 C.F.R. § 235.12.

64.     Ms. Fox frequently travels internationally.  She has multiple international trips scheduled over the next several months, including trips to Italy and the Dominican Republic in spring 2020.

65.     Ms. Fox planned to enroll in Global Entry to make her international travel more convenient and, in particular, to reduce processing times at the airport.  As a New York resident, she is no longer eligible to apply for Global Entry under the February 5 Rule.

66.     Because of the February 5 Rule, Ms. Fox can no longer apply for Global Entry as planned.

67.     Plaintiff Jocardo Ralston is a U.S. citizen and a resident of New York, New York. He teaches special education at a public school in New York.

68.     Mr. Ralston has a valid passport and meets the eligibility criteria for Global Entry set forth in 8 C.F.R. § 235.12.

69.     Mr. Ralston plans to travel to Buenos Aires, Argentina in February 2020.  He also plans to travel internationally during the school recess this summer.

70.     Mr. Ralston seeks to enroll in Global Entry to make his international travel more convenient and, in particular, to reduce processing times at the airport.  He decided to apply for Global Entry after missing a flight in September due to lengthy delays at the U.S. customs checkpoint in Montreal.

71.     Mr. Ralston submitted an online application for Global Entry on January 20, 2020, and paid the $100 application fee.  After applying, Mr. Ralston checked his online Trusted Traveler Program account.  The online account status indicated that his application was received and that an interview was pending.  His application remained pending at the time Defendants issued the February 5 Rule.

72.     After learning about the February 5 Rule, Mr. Ralston logged into his online Trusted Traveler Program account.  The account now states "no application[] in progress."  Upon information and belief, DHS has canceled his application under the February 5 Rule because he is a New York resident.

73.     DHS's changes to the eligibility requirements for its Trusted Traveler programs stand to irreparably harm Plaintiffs by preventing them from applying for and enrolling in Global Entry.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF APA—WITHOUT OBSERVANCE OF
### PROCEDURE REQUIRED BY LAW

74.     Plaintiffs re-allege each and every allegation in the foregoing paragraphs as if fully set forth herein.

75.     The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

76.     The APA requires agencies to publish notice of all "proposed rule making[s]" in the Federal Register, 5 U.S.C. § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).  The APA also generally requires "publication … of a substantive rule [to] be made not less than 30 days before its effective date."  *Id.* § 553(d).

77.     The IRTPA expressly calls for the Secretary of Homeland Security to "establish the [Global Entry] program, criteria for participation, and the fee for the program" by "rulemaking."  8 U.S.C. § 1365b(k)(3)(C).  The Secretary followed those directives when it first established Global Entry.  In November 2009, CBP published a notice of proposed rulemaking establishing the program, setting forth the eligibility criteria, and describing the application and enrollment process.  After receiving and responding to comments on the proposed rule, CBP issued the final Global Entry regulations in February 2012.

78.     The February 5 Rule is a "rule" as the term is used in the APA.  *See Safari Club Int'l v. Zinke*, 878 F.3d 316, 332-33 (D.C. Cir. 2017).  It is a substantive, legislative regulation that amends the previously promulgated criteria for participating in the Global Entry program.

79.     The February 5 Rule was not adopted through the notice-and-comment procedure required by 5 U.S.C. § 553 of the APA.  The rule was therefore promulgated "without observance of procedure required by law" and must be set aside under 5 U.S.C. § 706(2)(D).

## COUNT II
## VIOLATION OF APA—ARBITRARY AND CAPRICIOUS

80.     Plaintiffs re-allege each and every allegation in the foregoing paragraphs as if fully set forth herein.

81.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  Agency action is "[n]ormally" arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Veh. Mfrs. Ass'n v. State Farm Ins*., 463 U.S. 29, 43 (1983).

82.     The February 5 Rule is arbitrary and capricious in numerous respects.  The rule deprives millions of New York residents of the ability to participate in Global Entry, notwithstanding Congress's instruction that, given its importance to national security, the program should "include[] as many participants as practicable."  8 U.S.C. § 1365b(k)(3)(E); *see also id.* § 1365b(k)(1) (finding that Global Entry would "permit inspectors to better focus on identifying terrorists attempting to enter the United States").

83.     The rule does not give an adequate explanation for this dramatic policy change. In particular, it does not adequately explain why access to New York DMV records is necessary to administer the Global Entry program or to determine whether applicants present a "security threat."  *Id.* § 1365b(k)(A).  The evidence before the Acting Secretary made clear that DMV records are not, in fact, necessary to administer the program.  New York residents *without* state-issued driver's licenses, including Plaintiff Mr. DiMaio, were previously eligible to enroll in Global Entry, even though the New York DMV had no relevant information about them. Moreover, CBP continues to have access to state criminal records and other relevant information through, among other things, the FBI's National Crime Information Center (NCIC) database.

And CBP allows citizens and nationals of a dozen foreign countries to apply for and enroll in Global Entry.

84.     For these and other reasons, the February 5 Rule is "arbitrary, capricious, [and] an abuse of discretion" and must be set aside under 5 U.S.C. § 706(2)(A).

## COUNT III
## VIOLATION OF APA—NOT IN ACCORDANCE WITH LAW

85.     Plaintiffs re-allege each and every allegation in the foregoing paragraphs as if fully set forth herein.

86.     The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

87.     The February 5 Rule violates clear statutory limits on the Secretary's authority to establish the Global Entry program, including the statutory obligation to establish the "criteria for participation" by "rulemaking," 8 U.S.C. § 1365b(k)(3)(C), and to "ensure that the [] program includes as many participants as practicable," *id.* § 1365b(k)(3)(E).

88.     The February 5 Rule is therefore "not in accordance with law" and must be set aside under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask for the following relief as to all counts:

a.     Declare that the February 5 Rule is arbitrary and capricious, not in accordance with law, without observance of procedure required by law, and invalid;

b.     Set aside and vacate the February 5 Rule;

c.     Issue preliminary and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the February 5 Rule, by enjoining Defendants, their agents, employees, appointees, or successors, from enforcing, threatening to enforce, or

otherwise applying the provisions of the February 5 Rule against Plaintiffs and any other resident of the State of New York;

d.      Award Plaintiffs reasonable attorneys' fees and costs in pursuing this action under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.      Grant such other or further relief as the Court deems proper.

Dated:  February 14, 2020                    Respectfully submitted,

**ARNOLD & PORTER
  KAYE SCHOLER LLP**

/s/ Elisabeth S. Theodore
Elisabeth S. Theodore (D.C. Bar No. 1021029)
R. Stanton Jones (D.C. Bar No. 987088)
Andrew T. Tutt* (D.C. Bar No. 1026916)
Stephen K. Wirth (D.C. Bar No. 1034038)
Graham W. White (D.C. Bar No. 888273658)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
elisabeth.theodore@arnoldporter.com
stanton.jones@arnoldporter.com
andrew.tutt@arnoldporter.com
stephen.wirth@arnoldporter.com
graham.white@arnoldporter.com

*Counsel for Plaintiffs*

*D.D.C. application forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendants in accordance with

Fed. R. Civ. P. 4.

/s/ Graham W. White
Graham W. White
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
graham.white@arnoldporter.com