IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN DIMAIO, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>*Defendants*. | Case No. 1:20-cv-00445 |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Jonathan DiMaio, Cory Fox, and Jocardo Ralston hereby move for partial summary judgment on Count I of the Complaint: Violation of APA—Without Observance of Procedure Required By Law, on the ground that there is no genuine issue of disputed material fact and that they are entitled to judgment as a matter of law.

In support of this motion, plaintiffs submit the accompanying (1) memorandum, (2) statement of material facts as to which there is no genuine dispute, (3) declarations accompanying the statement of undisputed facts, and (4) a proposed order.


Dated:  March 13, 2020

Respectfully submitted,

**ARNOLD & PORTER**
   **KAYE SCHOLER LLP**

<u>/s/ Elisabeth S. Theodore</u>
Elisabeth S. Theodore (D.C. Bar No. 1021029)
R. Stanton Jones (D.C. Bar No. 987088)
Andrew T. Tutt (D.C. Bar No. 1026916)
Stephen K. Wirth (D.C. Bar No. 1034038)
Graham W. White (D.C. Bar No. 888273658)
Janine M. Lopez (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
elisabeth.theodore@arnoldporter.com
stanton.jones@arnoldporter.com
andrew.tutt@arnoldporter.com
stephen.wirth@arnoldporter.com
graham.white@arnoldporter.com
janine.lopez@arnoldporter.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JONATHAN DIMAIO, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security, et al.,<br><br>*Defendants*. | Case No.  1:20-cv-00445 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..........................................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

      A.      The Global Entry Program ................................................................................ 2

      B.      The February 5 Rule .......................................................................................... 5

      C.      The Impact of the Rule on Plaintiffs and Other New Yorkers ........................... 6

ARGUMENT ..................................................................................................................................7

I.      DEFENDANTS WERE REQUIRED TO ENGAGE IN NOTICE-AND-COMMENT RULEMAKING BEFORE ISSUING THE NEW GLOBAL ENTRY RULE ................... 7

      A.      The APA Requires Defendants To Engage in Notice-And-Comment Rulemaking Before Issuing a Legislative Rule, and the February 5 Rule is a Legislative Rule ................................................................................................. 7

      B.      The Intelligence Reform and Terrorism Prevention Act Requires Defendants to Engage in Notice-and-Comment Rulemaking Before Modifying Eligibility Criteria for Global Entry ...................................................................................... 10

II.     THE COURT MUST VACATE AND SET ASIDE THE RULE BECAUSE IT WAS ISSUED WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW ........ 11

CONCLUSION ............................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ............................................... 12

*Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014) ........................................... 11

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ................................................................. 7, 8

*Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ....................................................... 7

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ................................................................. 7

*Swanson Grp. Mfg. LLC v. Salazar*, 951 F. Supp. 2d 75 (D.D.C. 2013) ................................. 7, 12

**Statutes**

5 U.S.C. § 553 ........................................................................................................................ 7, 9, 11

5 U.S.C. § 706 .............................................................................................................................. 1, 10

8 U.S.C. § 1365b ................................................................................................................. 1, 2, 9, 10

Intelligence Reform and Terrorism Prevention Act of 2004, 118 Stat. 3638 ................................ 2

N.Y. Veh. & Traf. Law §§ 201, 502, 508 (2019) .......................................................................... 4

**Regulations**

8 C.F.R. § 235.12 ..................................................................................................................... 3, 5, 8

*Establishment of Global Entry Program*, 74 Fed. Reg. 59,932 (Nov. 19, 2009) ....................... 2, 9

*Expansion of Global Entry Pilot to Mexican Nationals*, 75 Fed. Reg. 82,200
   (Dec. 29, 2010) ........................................................................................................................... 10

*Expansion of Global Entry Eligibility to All Citizens of the Federal Republic of
   Germany*, 71 Fed. Reg. 7,822 (Feb. 16, 2016) .......................................................................... 10

*Expansion of Global Entry Eligibility to Certain Citizens of the Republic of Korea,
   the Federal Republic of Germany, the State of Qatar, and the United Kingdom*,
   78 Fed. Reg. 48,706 (Aug. 9, 2013) ........................................................................................... 10

*Expansion of Global Entry Eligibility to Citizens of the Republic of Colombia, Citizens of the Republic of Singapore, and Citizens of Switzerland*, 82 Fed. Reg. 37,892 (Aug. 14, 2017) .................................................................................... 10

*Expansion of Global Entry Eligibility to Citizens of the Republic of Panama*, 80 Fed. Reg. 1,509 (Jan. 12, 2015) ........................................................................................ 10

*Expansion of Global Entry to All Citizens of the United Kingdom*, 81 Fed. Reg. 45,170 (July 12, 2016) .......................................................................................................... 10

**INTRODUCTION**

This case is about a federal agency issuing an obvious substantive rule without notice-and-comment rulemaking, in flagrant violation of the Administrative Procedure Act, to the detriment of 20 million Americans. On February 5, 2020, the Acting Secretary of Homeland Security mailed a letter to New York state officials declaring that, effective "immediately," all New York residents "will no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs." Ex. A at 3 (the "February 5 Rule"). The letter asserted that this action was necessary in light of a recent New York law that generally bars federal immigration officials from accessing records from the New York Department of Motor Vehicles. The upshot of the February 5 Rule is this: The citizens of the remaining 49 states and the District of Columbia, along with nonimmigrant aliens from a dozen foreign countries including Mexico, Qatar, and Colombia, may apply for Trusted Traveler programs, while New Yorkers categorically cannot. Though this action effected a significant alteration of existing policy, Defendants took it without providing interested parties with notice or an opportunity to comment.

The February 5 Rule is unlawful. For one thing, the Administrative Procedure Act requires agencies to engage in notice-and-comment rulemaking before issuing rules that impose binding obligations or prohibitions on regulated parties, or that change existing law or policy. Defendants' letter does just that by depriving roughly 20 million New Yorkers of their ability to apply for or renew their participation in Global Entry and other Trusted Traveler programs. For another, the Intelligence Reform and Terrorism Prevention Act of 2004, which authorizes the Department of Homeland Security to establish the Global Entry program, *requires* DHS to engage in notice-and-comment rulemaking when establishing "criteria for participation" in the program. 8 U.S.C. § 1365b(k)(3)(E).

1

The APA requires reviewing courts to set aside agency action that is promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Because Defendants terminated the program eligibility of 20 million New Yorkers without engaging in notice-and-comment rulemaking, the Court should grant summary judgment for Plaintiffs on Count I of the Complaint, and vacate the February 5 Rule.[1]

## STATEMENT OF FACTS

### A.   The Global Entry Program

Congress authorized the Global Entry program in the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 118 Stat. 3638, a wide-ranging statute enacted in response to the terrorist attacks of September 11, 2001. The Act instructs the Secretary of Homeland Security to "establish an international registered traveler program that incorporates available technologies . . . and security threat assessments to expedite the screening and processing of international travelers." 8 U.S.C. § 1365b(k)(3)(A). Congress explained that the program "should be a high priority," because "expediting known travelers . . . permit[s] inspectors to better focus on identifying terrorists attempting to enter the United States." *Id.* § 1365b(k)(1)(A)-(B). To that end, Congress directed the Secretary to "ensure that the [Global Entry] program includes as many participants as practicable" by "making program enrollment convenient and easily accessible" and by "providing applicants with clear and consistent eligibility guidelines." *Id.* § 1365b(k)(3)(E).

IRTPA further directs the Secretary to "initiate a rulemaking to establish the program, criteria for participation, and the fee for the program." 8 U.S.C. § 1365b(k)(3)(C). In November

---

[1] The Complaint contains two additional counts that are not the subject of this motion for partial summary judgment. Count II of the Complaint alleges that the February 5 Rule is arbitrary and capricious, and thus unlawful under the APA. Count III alleges that the February 5 Rule is not in accordance with the law, and thus unlawful under the APA. *See* Compl. ¶¶ 80-88, ECF No. 1, *DiMaio v. Wolf*, 1:20-cv-00445 (D.D.C. Feb. 14, 2020).

2009, U.S. Customs and Border Protection (CBP) did just that. *See Establishment of Global Entry Program*, 74 Fed. Reg. 59,932 (Nov. 19, 2009). The notice explained in detail CBP's proposed regulations regarding the eligibility criteria, application process, and fee for participating in Global Entry. As required by the APA, the notice also explained the legal authority for the proposed rule and invited the public to submit comments and other relevant information. In February 2012, CBP published the final rule, largely adopting the proposed rule. *See Establishment of Global Entry Program*, 77 Fed. Reg. 5,681 (Feb. 6, 2012) (the "2012 Rule").

Under the 2012 Rule, an individual is eligible to apply for Global Entry if he (1) is a U.S. citizen, national, or lawful permanent resident; (2) holds a valid passport, permanent resident card, or other appropriate travel document; (3) has parental or guardian consent, if he is a minor; and (4) does not have any "disqualifying factors" that could render him ineligible to participate in the program. 8 C.F.R. § 235.12(b)(1). Those "disqualifying factors" are described in subsection (b)(2), which provides that an individual is "ineligible to participate" in Global Entry "if CBP, at its sole discretion, determines that the individual presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low-risk traveler." *Id.* § 235.12(b)(2). The regulation then lists seven specific factors that could make an applicant ineligible to participate, including prior criminal convictions, inadmissibility to the United States, and suspected terrorism. *Id.* § 235.12(b)(2)(i)-(vii).

The 2012 Rule neither excludes New Yorkers from eligibility for Global Entry, nor provides that an individual's state of residence determines his eligibility to participate in Global Entry. In fact, the regulations extend Global Entry eligibility to "[c]ertain nonimmigrant aliens"— namely, individuals from countries that operate their own trusted traveler programs and have entered into agreements with CBP regarding those programs. *Id.* § 235.12(b)(2)(ii). Nor does the

3

2012 Rule state that an applicant's eligibility for Global Entry depends on whether CBP can access DMV records in his state of residence.

The 2012 Rule also outlines the process of applying for Global Entry. To begin, an applicant completes an online application and pays a non-refundable $100 fee. 8 C.F.R. § 235.12(d)(1), (2). According to an Inspector General report on the Global Entry program, CBP runs the applicant's information in several databases to determine whether he meets the eligibility requirements; neither the 2012 Rule nor the Inspector General report indicates that state DMV records are among the databases CBP uses to assess eligibility.[2] If the application is conditionally approved, CBP contacts the applicant to schedule an in-person interview at a Global Entry Enrollment Center. 8 C.F.R. § 235.12(e)(1). At the interview, a CBP officer confirms the applicant's identity, validates the applicant's passport or other qualifying travel document, takes a photograph, collects fingerprints, and confirms that the applicant meets the eligibility criteria.

Approved Global Entry participants enjoy expedited processing upon their arrival at participating airports in the United States. A participant may proceed directly to an automated Global Entry kiosk, where he presents his passport or permanent resident card, verifies his fingerprints, and completes a customs declaration form. The kiosk then issues a transaction receipt, which the participant presents to a CBP officer to exit the screening area. According to CBP, Global Entry "speeds the CBP processing time for participating air travelers by more than 70%." 77 Fed. Reg. at 5,688. More than 75 percent of travelers using Global Entry are processed in under five minutes.[3]

---

[2] Office of Inspector General, Dep't of Homeland Security, *CBP's Global Entry Program Is Vulnerable to Exploitation* 2, 27-28 (June 24, 2019), *available at* https://bit.ly/38nSNli.

[3] U.S. Customs and Border Protection, *Trusted Traveler Programs: Fact Sheet* 2 (Oct. 2015), *available at* https://bit.ly/2wgQMcD.

4

**B.      The February 5 Rule**

On February 5, 2020, the Department announced a significant change to the eligibility criteria for its Trusted Traveler programs, including Global Entry.[4]  Specifically, the Department banned all New York residents, without exception, from enrolling or re-enrolling in any Trusted Traveler program.  *See* Ex. A.  The Department announced this change in a letter from Acting Secretary of Homeland Security Chad Wolf to two officials at the New York State Department of Motor Vehicles.  *Id.*

The Department explained that the reason for its change in policy was a recent New York law commonly known as the Green Light Law.  *See* Ex. B; *see also* N.Y. Veh. & Traf. Law §§ 201, 502, 508 (2019).  Among other things, the Green Light Law generally bars federal immigration officials from accessing DMV databases without a court order.  According to the letter, the Green Light Law "compromises CBP's ability to confirm whether an individual applying for [a Trusted Traveler program] membership meets program eligibility requirements."  Ex. A at 2.  The letter further states that the law "prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history," and therefore "requires DHS to take immediate action to ensure DHS's efforts to protect the Homeland are not compromised."  *Id.*  The letter concludes by stating that, effective "immediately," "New York residents will no longer be eligible to enroll or re-enroll in in CBP's Trusted Traveler Programs."  *Id.* at 3.

---

[4] The other Trusted Traveler programs operated by CBP are (1) the Secure Electronic Network for Travelers Rapid Inspection (SENTRI) program, which allows for expedited border crossing between the United States and Mexico; (2) the NEXUS program, which allows for expedited border crossing between the United States and Canada; and (3) the Free and Secure Trade (FAST) program, which allows for expedited entry by low-risk commercial carriers into the United States from Mexico or Canada.  *See* U.S. Customs and Border Protection, *Trusted Traveler Programs: Fact Sheet* (Oct. 2015), *available at* https://bit.ly/2wgQMcD.

5

### C.     The Impact of the Rule on Plaintiffs and Other New Yorkers

The Department's sudden and unexpected change in policy had an immediate and dramatic impact.  Most concretely, the Department has canceled the Global Entry applications of approximately 80,000 New Yorkers who had pending applications on February 5.  Pls.' Statement of Undisputed Material Facts ("SUMF") ¶ 8.  Plaintiff Jocardo Ralston, a special education teacher, is one of those individuals.  As Mr. Ralston has explained, he submitted an online application for Global Entry on January 20, 2020, and paid the $100 application fee.  SUMF ¶ 33.  After he applied, his online Trusted Traveler Program account indicated that his application was received and that an interview was pending.  *Id.*  His application remained pending at the time the Department announced the February 5 Rule.  *Id.*  After learning about the change in policy, Mr. Ralston logged into his online account again.  SUMF ¶ 34.  The account now states "no application[] in progress."  *Id.*  The Department has canceled his application under the February 5 Rule because he is a New York resident.  SUMF ¶ 35.

The February 5 Rule concretely harms hundreds of thousands of other New Yorkers as well; CBP itself estimates that the Rule is likely to affect 800,000 people over the next five years.  SUMF ¶ 10.  Nearly 20 million people currently reside in the State of New York.  SUMF ¶ 6.  Approximately 150,000 of those residents have enrollments in Trusted Traveler programs like Global Entry that will expire in 2020.  SUMF ¶ 8.  As a result of the February 5 Rule, these individuals are now categorically ineligible to renew their enrollments.  Meanwhile, all other New Yorkers are ineligible even to apply for Global Entry or other Trusted Traveler programs, including many individuals who had planned to submit their applications imminently.  For example, Plaintiff Jonathan DiMaio, a filmmaker, and Plaintiff Cory Fox, a teacher, had each planned to apply for Global Entry in early 2020.  SUMF ¶¶ 18, 25.  Both have valid passports and meet the eligibility criteria set forth in 8 C.F.R. § 235.12.  SUMF ¶¶ 15, 23.  Yet they are ineligible to participate in

Global Entry due to the February 5 Rule. SUMF ¶¶ 19, 26.

Plaintiffs, like many other New Yorkers, all have had plans to travel internationally in the coming months. SUMF ¶¶ 16-17, 24, 31. They hoped to enroll in Global Entry to make their international travel more convenient and, in particular, to reduce processing times at the airport; Mr. Ralston, for example, decided to apply for Global Entry after missing a flight in September due to lengthy delays at the U.S. customs checkpoint in Montreal. SUMF ¶¶ 18, 25, 32. Plaintiffs' inability to obtain Global Entry will make their upcoming travel more difficult. SUMF ¶¶ 20, 27, 36. If the February 5 Rule is vacated, Plaintiffs plan to apply (or, in Mr. Ralston's case, re-apply) for Global Entry. SUMF ¶¶ 21, 28, 37.

## ARGUMENT

### I. DEFENDANTS WERE REQUIRED TO ENGAGE IN NOTICE-AND-COMMENT RULEMAKING BEFORE ISSUING THE NEW GLOBAL ENTRY RULE

#### A. The APA Requires Defendants To Engage in Notice-And-Comment Rulemaking Before Issuing a Legislative Rule, and the February 5 Rule is a Legislative Rule

The APA requires agencies to provide notice and an opportunity to comment before issuing a legislative rule. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553. Agency action is a legislative rule if it is "binding" and has the "force and effect of law." *Perez*, 575 U.S. at 96; *Swanson Grp. Mfg. LLC v. Salazar*, 951 F. Supp. 2d 75, 84-85 (D.D.C. 2013), *overruled on other grounds sub nom. Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015). As the D.C. Circuit recently explained, "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties" is "a legislative rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). Similarly, "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1022

7

(D.C. Cir. 2014). In contrast, agency action is not a legislative rule if it "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties." *Nat'l Min. Ass'n*, 758 F.3d at 252.

The February 5 Rule is a legislative rule—and unambiguously so. For one thing, the Rule "impose[s] legally binding obligations or prohibitions on regulated parties." *Nat'l Min. Ass'n*, 758 F.3d at 251. It provides that, effective "immediately," "New York residents will no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs." Ex. A at 3. The effect of this action is to prohibit roughly 20 million residents of the State of New York from applying for or renewing their participation in Global Entry and other Trusted Traveler programs. SUMF ¶¶ 6-7. CBP itself has said that the Rule will immediately affect about 80,000 New York residents who have applications pending for Trusted Traveler programs like Global Entry. SUMF ¶ 8 & n.1. The Rule has already imposed a binding prohibition on Plaintiffs preventing them from applying for these programs. Plaintiffs Jonathan DiMaio and Cory Fox, who have valid U.S. passports and meet the eligibility criteria for Global Entry set forth in 8 C.F.R. § 235.12, planned to apply for Global Entry due to upcoming international travel and can no longer do so. SUMF ¶¶ 14-28. And Plaintiff Jocardo Ralston, who applied for Global Entry over two weeks before the February 5 Rule issued and paid the $100 application fee, logged into his online Trusted Traveler Program account only to learn that his application had been canceled due to his New York residency. SUMF ¶¶ 29-37.

The February 5 Rule is also legislative because it "adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1022. Before the February 5 Rule, CBP regulations provided that an individual was "eligible" to apply for Global Entry if he (1) is a citizen, national, or lawful permanent resident of

8

the United States, or is a nonimmigrant alien from a foreign country that has entered into an arrangement with CBP concerning trusted traveler programs; (2) holds a valid passport, permanent resident card, or other appropriate travel document; (3) has parental or guardian consent, if he is a minor; and (4) does not have any "disqualifying factors." 8 C.F.R. § 235.12(b)(1)(i)-(iii). CBP regulations further provide seven "disqualifying factors," such as criminal history. 8 C.F.R. § 235.12(b)(2)(i)-(vii). New York residency is not a "disqualifying factor." *Id.*

The February 5 Rule effects a substantive change in existing policy and amends the 2012 Rule's eligibility criteria. Previously, citizens, nationals, and lawful permanent residents of the United States, as well as certain foreign nationals, were eligible for membership in Global Entry and other Trusted Traveler Programs subject to remaining criteria listed above. New Yorkers who met those criteria were eligible. Now, only citizens, nationals, or lawful permanent residents of the United States *who do not reside in New York*, along with certain foreign nationals, are eligible. Indeed, the effect of the February 5 Rule is that New Yorkers will, categorically, "*no longer* be eligible" for these programs. Ex. A at 3 (emphasis added). Because the Rule adopts a new position inconsistent with existing regulations and effects a substantive change in existing policy, it is a legislative rule that must be promulgated under the APA's notice-and-comment procedures. *Mendoza*, 754 F.3d at 1022.

No exception to the APA's notice-and-comment procedures applies here. Nor did Defendants purport to cite any exception in the letter announcing the February 5 Rule. Accordingly, because the February 5 Rule was issued without notice-and-comment rulemaking, it is invalid under the APA.

9

### B. The Intelligence Reform and Terrorism Prevention Act Requires Defendants to Engage in Notice-and-Comment Rulemaking Before Modifying Eligibility Criteria for Global Entry

Beyond the clear APA violation, the Rule is independently unlawful because IRTPA also required Defendants to engage in notice-and-comment rulemaking before modifying the eligibility criteria for Global Entry, as the February 5 Rule does. *See* 5 U.S.C. § 553(b)(3) (stating that general APA exceptions to notice-and-comment rulemaking do not apply if "notice or hearing is required by statute").

IRTPA authorizes DHS to establish the Global Entry program. *See* 8 U.S.C. § 1365b(k)(3)(A) (instructing the Secretary of Homeland Security to "establish an international registered traveler program that incorporates available technologies . . . and security threat assessments to expedite the screening and processing of international travelers"). The Act further directs the Secretary to do so through rulemaking—*i.e.*, to "*initiate a rulemaking* to establish the program, criteria for participation, and the fee for the program." *Id.* § 1365b(k)(3)(C) (emphasis added). DHS acknowledged as much when it published a notice in the Federal Register of a proposed rulemaking establishing the Global Entry Program in the first place. *See Establishment of Global Entry Program*, 74 Fed. Reg. 59,932, 59,932 (Nov. 19, 2009) ("IRTPA requires DHS to initiate a rulemaking action to establish the criteria to participate in the program . . . . This rule meets that requirement by proposing, among other things, the criteria for participation."). The eligibility criteria for Global Entry set forth in the 2012 Rule complied with the APA's notice-and-comment requirements.

The February 5 Rule must also be promulgated through notice-and-comment rulemaking because it "establish[es] . . . criteria for participation" in Global Entry and other Trusted Traveler Programs. 8 U.S.C. § 1365b(k)(3)(C). The Rule does so by establishing that all New Yorkers are categorically barred from participating in these programs. Defendants therefore violated IRTPA's

rulemaking requirement when they immediately terminated program eligibility for all New Yorkers by mailing a letter, rather than engaging in notice-and-comment rulemaking.

## II.  THE COURT MUST VACATE AND SET ASIDE THE RULE BECAUSE IT WAS ISSUED WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

The Court must set aside the February 5 Rule because it is a legislative rule that was not promulgated under the notice-and-comment procedures required by both the APA and IRTPA. The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Notice-and-comment rulemaking requires the agency to provide advance publication of the rule in the Federal Register; an opportunity for public participation through submission of written comments; and publication of the final rule, incorporating a concise statement of its basis and purpose, 30 days before it takes effect. 5 U.S.C. § 553.

These procedures required Defendants to notify the public in advance that they intended to modify—indeed, eliminate—the eligibility of New Yorkers for Trusted Traveler programs in light of New York's Green Light Law. This notice-and-comment process "serves important purposes both generally and in the [APA]." *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 88 (D.C. Cir. 2014) (Kavanaugh, J.). Had Defendants followed the process here, interested persons and groups would have had the opportunity to demonstrate through the submission of comments that DHS's ban on New Yorkers was unjustifiable for a variety of reasons. Commenters might have noted, for example, that DHS can obtain the information needed to assess program eligibility through other means, such as the FBI's database of criminal convictions. Or that the categorical ban on eligibility for New Yorkers is irrational given that citizens of eleven foreign countries, along with Mexican nationals (whether citizens or not), are still eligible to apply for these

programs.[5]  Defendants would then have reviewed and responded to these comments, and made any appropriate modifications to the Rule.  That is how the administrative process is supposed to work.  While "somewhat burdensome," notice-and-comment rulemaking "helps to prevent mistakes" and "ensures that regulated parties"—here, roughly 20 million New Yorkers—"receive fair treatment, a value basic to American administrative law."  *Ivy Sports Medicine,* 767 F.3d at 87-88.

But Defendants did none of these things.  Rather, without observing any of the procedure required by law, Defendants simply mailed a letter to New York officials declaring that, effective "immediately," all New Yorkers were "no longer . . . eligible" for Trusted Traveler programs.  Ex. A at 3.  This is precisely the sort of unaccountable agency action that Congress enacted the APA to prevent.  Because Defendants failed to follow the notice-and-comment procedures required under the APA and IRTPA before terminating Trusted Traveler program eligibility for 20 million New Yorkers, the February 5 Rule must be set aside and vacated.  *See Swanson*, 951 F. Supp. 2d at 88 (vacating agency rule for failure to comply with notice-and-comment rulemaking); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1028 (D.C. Cir. 2000) (same).

---

[5] *See Expansion of Global Entry Eligibility to Citizens of the Republic of Colombia, Citizens of the Republic of Singapore, and Citizens of Switzerland*, 82 Fed. Reg. 37,892 (Aug. 14, 2017); *Expansion of Global Entry to All Citizens of the United Kingdom*, 81 Fed. Reg. 45,170 (July 12, 2016); *Expansion of Global Entry Eligibility to All Citizens of the Federal Republic of Germany*, 71 Fed. Reg. 7,822 (Feb. 16, 2016); *Expansion of Global Entry Eligibility to Citizens of the Republic of Panama*, 80 Fed. Reg. 1,509 (Jan. 12, 2015); *Expansion of Global Entry Eligibility to Certain Citizens of the Republic of Korea, the Federal Republic of Germany, the State of Qatar, and the United Kingdom*, 78 Fed. Reg. 48,706 (Aug. 9, 2013); *Expansion of Global Entry Pilot to Mexican Nationals*, 75 Fed. Reg. 82,200 (Dec. 29, 2010).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment on Count I, declare that the February 5 Rule is unlawful because it was "without observance of procedure required by law," and vacate the February 5 Rule.

Dated:  March 13, 2020                                    Respectfully submitted,

**ARNOLD & PORTER
   KAYE SCHOLER LLP**

/s/ Elisabeth S. Theodore
Elisabeth S. Theodore (D.C. Bar No. 1021029)
R. Stanton Jones (D.C. Bar No. 987088)
Andrew T. Tutt (D.C. Bar No. 1026916)
Stephen K. Wirth (D.C. Bar No. 1034038)
Graham W. White (D.C. Bar No. 888273658)
Janine M. Lopez (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
elisabeth.theodore@arnoldporter.com
stanton.jones@arnoldporter.com
andrew.tutt@arnoldporter.com
stephen.wirth@arnoldporter.com
graham.white@arnoldporter.com
janine.lopez@arnoldporter.com

*Counsel for Plaintiffs*