**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

JONATHAN DIMAIO, et al.                   )
                                          )
                        Plaintiffs,       )
            v.                            )        No.  1:20-cv-00445-RJL
                                          )
CHAD WOLF, et al.                         )
                                          )
                        Defendants.       )
_____ )

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

TIMOTHY J. SHEA                           DENA M. ROTH
United States Attorney                    CHARLES E.T. ROBERTS
                                          Trial Attorneys, Federal Programs Branch
JOSPEPH HUNT                              United States Department of Justice
Assistant Attorney General               Civil Division, Federal Programs Branch
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director, Federal Programs
Branch


                                          *Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.       Statutory And Regulatory Background........................................................... 3

          A.       The Intelligence Reform And Terrorism Prevention Act Of 2004. ........... 3

          B.       The New York Green Light Law             6

    II.      Factual Background. ...................................................................................... 8

LEGAL STANDARD.......................................................................................................... 9

ARGUMENT ...................................................................................................................... 9

    I.       DHS's Determination Regarding Global Entry Applications From New York Residents Is Unreviewable Because Such Determinations Are Committed To Agency Discretion By Law. ........................................................ 9

    II.      The February 5 Letter Is Not Subject To The APA's Notice-And-Comment Requirements........................................................................................ 14

          A.       The February 5 Letter Is Exempt From The APA's Rulemaking Requirements Because It Is Not A Substantive Rule................................ 14

                 1.       The February 5 Letter Is A General Statement Of Policy. ........... 14

                 2.       The February 5 Letter Could Also Be Understood As An Interpretive Rule. ....................................................................... 16

          B.       The IRTPA Does Not Require Notice-And-Comment Rulemaking. ....... 18

          C.       Even If The February 5 Letter Were A Substantive Rule, Defendants Had Good Cause To Dispense With Notice-And-Comment Rulemaking. ........................................................................ 19

    III.      The Court Should Not Vacate The Changes Described In The February 5 Letter Because Any Procedural Error Was Harmless........................................... 21

CONCLUSION.................................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ............................................................................... 22

*Allina Health Servs. v. Sebelius,*
 746 F.3d 1102 (D.C. Cir. 2014) ............................................................................. 21

*Am. Mining Congress v. Mine Safety & Health Admin.,*
 995 F.2d 1106 (D.C. Cir. 1993) ....................................................................... 16, 17

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ............................................................................................... 9

*Bauer v. DeVos,*
 325 F. Supp. 3d 74 (D.D.C. 2018) ......................................................................... 20

*Dep't of the Navy v. Egan,*
 484 U.S. 518 (1988) ......................................................................................... 10, 12

*Drake v. FAA,*
 291 F.3d 59 (D.C. Cir. 2002) ................................................................................ 10

*Fertilizer Inst. v. EPA,*
 935 F.2d 1303 (D.C. Cir. 1991) ............................................................................ 16

*Heckler v. Chaney,*
 470 U.S. 821 (1985) .............................................................................................. 10

*In re Sealed Case,*
 131 F.3d 208 (D.C. Cir. 1997) ......................................................................... 10, 12

*Jifry v. FAA,*
 370 F.3d 1174 (D.C. Cir. 2004) ............................................................................ 19

*Lincoln v. Vigil,*
 508 U.S. 182 (1993) ................................................................................... 11, 14, 15

*Mack Trucks, Inc. v. EPA,*
 682 F.3d 87 (D.C. Cir. 2012) ........................................................................... 19, 21

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ........................................................................ 17

*Nat'l Fed'n of Fed. Emps. v. Devine*,
  671 F.2d 607 (D.C. Cir. 1982) .......................................................................... 21

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) .......................................................................... 14

*Nat'l Venture Capital Ass'n v. Duke*,
  291 F. Supp. 3d 5 (D.D.C. 2017) ...................................................................... 21

*Orengo Caraballo v. Reich*,
  11 F.3d 186 (D.C. Cir. 1993) ............................................................................ 16

*Oryszak v. Sullivan*,
  576 F.3d 522 (D.C. Cir. 2009) .................................................................... 10, 12

*PDK Labs. v. DEA*,
  362 F.3d 786 (D.C. Cir. 2004) .................................................................... 21, 23

*Roberts v. Napolitano*,
  792 F. Supp. 2d 67 (D.D.C. 2011) ............................................................ 10, 11, 13

*Sec'y of Labor v. Twentymile Coal Co.*,
  456 F.3d 151 (D.C. Cir. 2006) .......................................................................... 10

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ............................................................................................ 16

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) .......................................................................... 20

*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) .......................................................................... 10

*Wayte v. United States*,
  470 U.S. 598 (1985) .......................................................................................... 13

*Webster v. Doe*,
  486 U.S. 592 (1988) .......................................................................................... 10

*Wye Oak Tech., Inc. v. Republic of Iraq*,
No. 1:10-CV-01182-RCL, 2018 WL 5983385 (D.D.C. Nov. 14, 2018) ................................... 9

**<u>Statutes</u>**

5 U.S.C. § 553 ................................................................................................ 8, 9, 19, 20

5 U.S.C. § 701 .......................................................................................................... 2, 10

5 U.S.C. § 702 ............................................................................................................... 10

5 U.S.C. § 706 ............................................................................................................... 21

8 U.S.C. § 1365b ........................................................................................... 1, 3, 11, 18

N.Y. Veh. & Traf. Law § 201.12. ........................................................................... 6, 7

**<u>Regulations</u>**

8 C.F.R. § 235.12 ................................................................................................... *passim*

73 Fed. Reg. 19,861 (April 11, 2008) ................................................................... 4, 18

74 Fed. Reg. 59,934 (November 19, 2009) ................................................................. 4

77 Fed. Reg. 5681 (February 6, 2012) ..................................................................... 4, 5

<u>Other Authorities</u>

The 9/11 Commission Report,
https://govinfo.library.unt.edu/911/report/911Report.pdf ......................................... 1

## INTRODUCTION

Following the September 11 attacks, the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission") urged the Government to take a number of concrete actions to secure the nation's borders and airspace.  To prevent the entry of terrorists, the 9/11 Commission recommended that the Government modernize its ability to gather and share information about travelers exiting and entering the country and, given limited resources, to set risk-based priorities for assessing travelers at border checkpoints.  To balance increased security measures at borders, the 9/11 Commission further recommended the creation of programs "to speed known travelers," thereby "permitting inspectors to focus on greater risks."  The 9/11 Commission Report 388, https://govinfo.library.unt.edu/911/report/911Report.pdf.  The Commission noted that "[a]n individual should be able to preenroll, with his or her identity verified in passage.  Updates of database information and other checks can ensure ongoing reliability."  *Id.*

In 2004, Congress passed legislation to implement the 9/11 Commission's recommendations.  As relevant here, Congress directed the Secretary of Homeland Security to create "an international registered traveler program . . . to expedite the screening and processing of international travelers, including United States Citizens and residents, who enter and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).  The Department of Homeland Security (DHS) fulfilled this mandate in 2009 by creating the Global Entry Program.  In promulgating the Global Entry Program regulations, U.S. Customs and Border Protection (CBP) set forth eligibility criteria, including certain "disqualifying factors."  Among the "disqualifying factors" is a determination by CBP, "at its sole discretion," that an individual "is otherwise not a low-risk traveler."  8 C.F.R. § 235.12(b)(1)–(2).  An individual may fall into this category if "[t]he applicant cannot satisfy CBP of his or her low-risk status."  *Id.* § 235.12(b)(2)(vii).

1

From its inception as a pilot program, CBP has evaluated eligibility and disqualifying factors with an examination into, among other things, an applicant's state, federal, and local criminal history (including the existence of pending investigations).  And this examination requires, as a necessary predicate, consultation with and ongoing access to certain state databases, including Department of Motor Vehicle (DMV) records, to verify the truthfulness of applicants' submissions and assess the risk posed by approving an application.

On December 12, 2019, the State of New York, pursuant to its so-called "Green Light" Law, revoked CBP's access to state DMV records.  On February 5, 2020, the Acting Secretary of Homeland Security informed state officials that, as a result of New York's unilateral rescission of CBP's access to these records, CBP could no longer determine whether New York residents who apply for a Trusted Traveler Program meet eligibility requirements, including that the applicant is a low-risk traveler.

Plaintiffs, who are New York residents, brought this suit challenging the February 5 Letter.  Plaintiffs allege, as relevant here, that the Letter is substantive rule that was promulgated in violation of the notice-and-comment requirements of the Administrative Procedure Act (APA).  They have moved for summary judgment on this claim.  But this claim fails for several reasons.  First, the APA precludes judicial review of matters committed to agency discretion by law.  Here, the Letter concerned a matter squarely committed to CBP's discretion by statute and regulation—namely, whether CBP had sufficient information to satisfy itself that travelers applying for admission to the Global Entry Program meet eligibility requirements, including that they are "low-risk traveler[s]."  Therefore, Plaintiffs have failed to state a claim under the APA. *See* 5 U.S.C. § 701.  Second, the APA itself obviated the need for notice-and-comment.  The Letter is not a substantive rule and, even if it were, the agency had good cause to proceed without notice and comment.   At the very least, any notice-and-comment error was harmless.  For these

reasons, and those explained more fully below, the Court should deny Plaintiff's motion for summary judgment on Count I of Plaintiffs' Complaint.

## BACKGROUND

I.    **Statutory And Regulatory Background.**

   A.  **The Intelligence Reform And Terrorism Prevention Act Of 2004.**

   Citing the 9/11 Commission Report, the Intelligence Reform and Terrorism Prevention Act of 2004 (the "IRTPA" or the "Act") provides that "[t]he Secretary of Homeland Security shall establish an international registered traveler program . . . to expedite the screening and processing of international travelers . . . who enter and exit the United States."  8 U.S.C. § 1365b(k)(3)(A).  The Act directs the Secretary to initiate a rulemaking "to establish the program, criteria for participation, and the fee for the program."  *Id.* § 1365b(k)(3)(C).  The Act further provides that in designing such a program, "[t]he Secretary shall ensure that the international registered traveler program includes as many participants as practicable by: (i) establishing a reasonable cost of enrollment; (ii) making program enrollment convenient and easily accessible; and (iii) providing applicants with clear and consistent eligibility guidelines." *Id.* § 1365b(k)(3)(E).  The IRTPA directed the Secretary of Homeland Security ("the Secretary") to initiate a rulemaking to establish the program "[w]ithin 365 days after December 26, 2007." *Id.* § 1365b(k)(3)(C).

   Under the IRTPA's mandate, the Secretary created Global Entry, one of the Trusted Traveler Programs (TTP) that DHS operates, together with NEXUS, SENTRI, and FAST. Enrollment in these programs enables CBP to expedite the inspection and security-vetting process for low-risk travelers, allowing CBP to focus vetting resources on individuals who present an unknown risk.  Low-risk travelers are directed to dedicated lanes and kiosks at

airports for expedited processing resulting from CBP's pre-approval activities.  *See* Defs.' Ex. A, Decl. of John P. Wagner in Support of Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. ("Wagner Decl."), ¶ 9; *see also id.* ¶¶ 10–13 (describing Global Entry, NEXUS, SENTRI, and FAST programs).

On April 11, 2008, in accordance with § 1365b(k)(3)(C), the Secretary announced the pilot program that would later be rebranded as Global Entry.  73 Fed. Reg. 19,861 (April 11, 2008).  The pilot program notice provided, in part, that no person would be eligible to participate "if he or she has ever been convicted of a criminal offense, or if he or she has ever been found in violation of the customs or immigration laws of the United States, or of any criminal law."  *Id.* at 19,863.  It further noted that "CBP will continue to conduct periodic checks for all enrolled members during the entire period of the pilot (and/or the permanent version of the program, at the point it becomes permanent), to ensure that CBP can quickly take action should new information be made available that would disqualify the participant."  *Id.* at 19,864.

After concluding that the pilot program was "successful," the Secretary published, on November 19, 2009, a notice of proposed rulemaking (NPRM) to establish the permanent Global Entry Program.  74 Fed. Reg. 59,934 (November 19, 2009).  The NPRM carried over the pilot program's disqualification of anyone with "pending criminal charges or outstanding warrants" and proposed to add anyone who "is the subject of an investigation by any Federal, State, or local law enforcement agency."  74 Fed. Reg. at 59,934.  It also carried over the pilot's concept of "periodic checks" for "each time [the applicant] uses the Global Entry kiosk."  *Id.* at 59,935. On February 6, 2012, the Secretary published the final rules for the Global Entry Program.  77 Fed. Reg. 5681 (February 6, 2012) (codified at 8 C.F.R. § 235.12) ("the 2012 Final Rule").

The Global Entry Program was expressly modeled on the Global Entry pilot program

established in 2008.  *Id.* (citing the Global Entry pilot notice and the Global Entry NPRM).  The program "is a voluntary international trusted traveler program consisting of an integrated passenger processing system that expedites the movement of low-risk air travelers into the United States by providing an alternate inspection process for pre-approved, pre-screened travelers."  8 C.F.R. § 235.12(a).  U.S. citizens, nationals, and lawful permanent residents, and certain nonimmigrant aliens, with appropriate travel documents may apply to participate in Global Entry.  *Id.* § 235.12(b)(1).  Such individuals are ineligible to participate in the program, however, if certain "disqualifying factors" are present.  In particular, "[a]n individual is ineligible to participate in Global Entry if CBP, at its sole discretion, determines that the individual presents a potential risk for terrorism, criminality (such as smuggling), or *is otherwise not a low-risk traveler*."  *Id.* § 235.12(b)(2) (emphasis added).  The regulations further identify specific, though non-exhaustive, reasons why "an applicant may not qualify for participation."  *Id.*  These include: "[t]he applicant provides false or incomplete information on the application"; "[t]he applicant has been arrested for, or convicted of, any criminal offense or has pending criminal charges or outstanding warrants in any country"; "[t]he applicant is the subject of an investigation by any federal, state, or local law enforcement agency in any country"; or "[t]he applicant cannot satisfy CBP of his or her low-risk status or meet other program requirements."  *Id.* § 235.12(b)(2)(i)–(ii), (iv), (vii).  As this non-exhaustive list suggests, an individual may meet certain eligibility criteria (*i.e.*, be a U.S. citizen or a legal permanent resident with a valid passport) but nevertheless not obtain membership in the program.  Wagner Decl. ¶ 17.

From the inception of the Global Entry program in 2008, CBP has relied upon a range of state and federal databases to evaluate eligibility under these provisions, including to determine the presence of disqualifying factors.  *Id.* ¶ 19-20.  To verify that the information an applicant

supplies with their application is accurate and to ensure that no disqualifying factors exist before granting membership, CBP checks those databases before deciding on an application to enroll or re-enroll, as well as periodically for all enrolled members.  *Id.*  Among these databases is the National Law Enforcement Telecommunications System ("Nlets"), through which CBP accessed information maintained by the New York DMV.  *Id.* ¶¶ 21, 23.  CBP checks Nlets for real-time driver license and vehicle data — regardless of whether applicants provide driver license information or indicate that they have a driver license — both "to validate the applicant's identity and to identify certain information pertaining to vehicle-related violations, even from jurisdictions where the applicant is not licensed."  *Id.* ¶ 21.  This allows CBP to discover violations an applicant may fail to disclose — such as driving without a license — and is essential to developing "a complete picture" of an applicant's background before determining whether he or she satisfies the low-risk requirement.  *Id.* ¶¶ 21, 24, 27.

### B.  The New York Green Light Law

More than a decade after the Global Entry pilot program began, on June 17, 2019, the Governor of New York signed into law the Driver's License Access and Privacy Act, also known as the "Green Light" Law.  Effective December 14, 2019, Section 12 of the Green Light Law provides that "the Commissioner [of Motor Vehicles] . . . shall not disclose or make accessible in any manner records or information that he or she maintains, to any agency that primarily enforces immigration law."  N.Y. Veh. & Traf. Law § 201.12.  It further provides that "[t]he Commissioner shall require any person or entity that receives or has access to records or information from the [D]epartment to certify to the [C]ommissioner, before such receipt or access, that such person or entity shall not . . . disclose such records or information to any agency that primarily enforce immigration law."  *Id.*  To remove any doubt, the law specifically noted

that the law prohibits data sharing with CBP.  *Id.*

As a result of these changes, CBP lost the ability to vet applications for Global Entry consistent with its longstanding evaluation process.  Since December 12, 2019, the agency has been unable to access driver license and vehicle data through Nlets for individuals with a New York residence.  Wagner Decl. ¶ 23.  Without that access, CBP cannot complete the picture it needs to be assured of an applicant's low-risk status.  *Id.* ¶ 24.  Certain vehicle-related and other violations can be verified only by searching DMV records through Nlets, even though certain criminal vehicle-related violations may be reflected in other databases the agency can still access.  *Id.*  In particular, non-criminal driver license and vehicle data, and even some aspects of New York applicants' criminal history, such as misdemeanor traffic arrests, are available only through the New York DMV feed to Nlets.  *Id.*  This is true regardless of whether applicants provide driver license information or have driver licenses because such individuals could still have recorded violations with the DMV, such as driving without a license.  *Id.* ¶¶ 21, 24.  Moreover, since losing access to New York DMV data, CBP "is unable to obtain, from any source, an up-to-date feed" for the data the DMV maintains.  *Id.* ¶ 25.  Historical information, even if it could be obtained by way of a court order[1] or from an applicant directly, would be "insufficient to facilitate the necessary risk assessments," as well as impracticable and burdensome for the agency, which already takes up to seven months to process an average application.  *Id.* ¶¶ 25–26.  In short, CBP could "no longer fully vet any Trusted Traveler Program applicant with a New York residence" once the State shut off its access to DMV data.

---

[1] Although the Green Light Law mentions obtaining DMV information pursuant to a court order, it is unclear whether background vetting would provide grounds for obtaining such an order and, in any event, it would be impracticable to obtain such an order for each application.  Wagner Decl. ¶ 25.

*Id.* ¶ 27.

## II.   Factual Background.

On February 5, 2020, Acting Secretary Wolf sent a letter concerning the Green Light

Law to Acting Commissioner of the New York State DMV Mark J.F. Schroeder and Executive

Deputy Commissioner Theresa L. Egan.  The Acting Secretary explained that the Green Light

Law "precludes [CBP] and Immigration and Customs Enforcement (ICE) from accessing and

validating pertinent information contained in New York DMV records that is operationally

critical in DHS's efforts to keep our nation secure."  Pls.' Ex. A, Dkt. No. 11-2 at 2 ("the

February 5 Letter").  Consistent with the agency's decade-long operation of the Global Entry

Program, he further explained that "[h]aving access to New York DMV information has enabled

CBP to validate that an individual applying for [TTP] membership qualifies for low-risk status"

because those individuals' "criminal history affects their eligibility."  *Id.*  The Acting Secretary

concluded by explaining that "[b]ecause the Act prevents DHS from accessing New York DMV

records in order to determine whether a TTP applicant or re-applicant meets program eligibility

requirements, New York residents will no longer be eligible to enroll or re-enroll in CBP's

Trusted Traveler Programs."  *Id.* at 3–4.

Shortly after the letter was sent, Plaintiffs filed this action against DHS and CBP.

Plaintiffs are three New York residents who allege that they either intended to apply for, or had

already applied for, membership in the Global Entry Program.  Compl. ¶¶ 56–72.  They allege

that "DHS's changes to the eligibility requirements for its Trusted Traveler programs stand to

irreparably harm Plaintiffs by preventing them from applying for and enrolling in Global Entry."

*Id.* ¶ 73.  Plaintiffs have moved for partial summary judgment on Count I of the Complaint,

which alleges that the February 5 Letter was a substantive rule that was not adopted through

notice-and-comment rulemaking in violation of the APA, 5 U.S.C. § 553.  Compl. ¶ 79.

## LEGAL STANDARD

"In making a summary judgment determination, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. [] However, 'the mere existence of a scintilla of evidence in support of the non-moving party' is insufficient to create a genuine dispute of material fact.  Instead, evidence must exist on which the decision-maker could reasonably find for the non-moving party.'" *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-CV-01182-RCL, 2018 WL 5983385, at *2 (D.D.C. Nov. 14, 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## ARGUMENT

The Court should deny Plaintiffs' Motion for Partial Summary Judgment for four independent reasons.  First, Plaintiffs fail to state a claim for relief under the APA because the agency's action is committed to agency discretion by law.  Second, the February 5 Letter is not a substantive rule, but either a statement of policy or interpretative rule, neither of which is subject to the APA's notice-and-comment requirements.  Third, even if it were a substantive rule, Defendants were not required to engage in notice-and-comment rulemaking because doing so would have been "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  Finally, because New York residents' applications for Global Entry would not be granted with or without the February 5 Letter given the unavailability of DMV information, the lack of notice-and-comment rulemaking is harmless error.

**I.      DHS's Determination Regarding Global Entry Applications From New York Residents Is Unreviewable Because Such Determinations Are Committed to Agency Discretion By Law.**

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute." 5 U.S.C. § 702.  It withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id.* § 701(a)(2).  Under this provision, "[a]gency action is committed to agency discretion by law when the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion [rendering] meaningful judicial review [] impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  This is true "even where Congress has not affirmatively precluded review."  *Heckler*, 470 U.S. at 830.

To determine whether a decision is committed to agency discretion, courts "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (quoting *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).  Hallmarks of a decision committed to agency discretion include: a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988); general criteria that make it difficult for courts to meaningfully second-guess an agency's determination, *see id.* ("advisable in the interests of the United States" is unreviewable); "review of the breadth of the margin of error acceptable in assessing the security risk posed by an individual," *Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) (citing *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988)); or decisions closely analogous to prosecutorial discretion, *see In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997).  Notably, this Court has previously held that DHS's decision whether to deny entry into the Global Entry Program is committed to agency discretion. *Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73–74 (D.D.C. 2011) (Howell,

J.).[2]  Plaintiffs offer no reason that warrants a different conclusion here.

The relevant provisions in the IRTPA plainly commit eligibility determinations to the discretion of DHS.  *See id.* at 73.  The IRTPA does not specify the factors DHS must consider in approving or denying Global Entry applications.  On the contrary, the IRTPA simply specifies that "the Secretary of Homeland Security shall establish an international registered traveler program," 8 U.S.C. § 1365b(k)(A), leaving to DHS complete discretion to define the eligibility criteria.  *See id.* § 1365b(k)(3)(C) ("[T]he Secretary shall initiate a rulemaking to establish the program, *criteria for participation*, and the fee for the program." (emphasis added)).  As the sole statutory reference to "criteria" suggests, the statute provides no standard — much less a meaningful one — for defining or determining eligibility.  *See Roberts*, 792 F. Supp. 2d at 73–74 ("The statute's silence on this issue indicates that Congress committed to [DHS] the sole discretion to determine eligibility guidelines and evaluate applicants.").  The statute does set a highly generalized, qualitative goal to "include[] as many participants as practicable by," among other things, "providing applicants with clear and consistent eligibility guidelines," 8 U.S.C. § 1365b(k)(3)(E), but it does not provide any substantive standard by which that goal is to be achieved.  *Cf. Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (statutory standard's "generality . . . underscores the administrative discretion inherent in the determination").  The statute, in short, contemplates discretion at every turn, without supplying any judicially manageable standard to

---

[2] There, plaintiff petitioned for a writ of mandamus to compel CBP to enroll him in the Global Entry pilot program, after CBP denied plaintiff's application because he had been arrested for a criminal offense and because he did not meet program eligibility requirements.  *Roberts*, 792 F. Supp. 2d at 71.  In granting CBP's motion to dismiss, the Court found both that it was precluded from reviewing CBP's decision to deny the plaintiff's application for entry into the Global Entry program, and even assuming it could review the decision, CBP's denial of the application was not arbitrary and capricious because the stated reason for denial was "in full accordance with its proposed guidelines."  *Id.* at 74 (citing 74 Fed. Reg. 59934 (Nov. 19, 2009)).

guide such discretion.  Indeed, determining whether a Global Entry applicant presents a low risk involves precisely the kind of sensitive, predictive judgment with significant national security implications that is a hallmark of nonreviewable agency action.  *See Oryszak*, 576 F.3d at 526 (decision whether to issue security clearance committed to agency discretion); *see also Egan*, 484 U.S. at 529 (same).

Nor do the regulations promulgated pursuant to the IRTPA provide the judicially manageable standard that the statute lacks.  The regulation commits the determination whether to disqualify an applicant because he or she cannot assure CBP of their low-risk status to the agency's "sole discretion."  8 C.F.R. § 235.12(b)(2).  The regulation lists reasons for disqualification that are highly general and non-exhaustive, while leaving undefined how the CBP ought to assure itself of a traveler's low-risk status (which makes a great deal of sense, given the gravity of errantly granting Global Entry status).  *See id.* ("This risk determination will be based in part upon an applicant's ability to demonstrate past compliance with laws, regulations, and policies.  Reasons why an applicant may not qualify for participation *include* . . . ." (emphasis added)); *see also* Wagner Decl. ¶ 17 ("An individual may meet application eligibility criteria . . . but may not qualify for membership based on a risk assessment.")*.*  And the regulations, as previewed in the 2008 pilot program and 2009 NPRM, contemplate required and ongoing access to an applicant's federal, state, and local criminal history to obtain and maintain eligibility.  8 C.F.R. § 235.12(b)(2)(ii), (iv); *see also id.* § 235.12(d)(3) & (k) (noting that participation may be "suspended or terminated").  The breadth of the discretion conferred by these provisions forecloses finding the "meaningful standard"

required for judicial review.[3]

The Letter itself bears further witness to this reality.  It reflects the agency's discretionary determination about New York residents' inability to satisfy CBP of their low-risk status, given the loss of CBP's access to New York DMV data that CBP had long used to assess an applicant's low-risk status.  Wagner Decl. ¶¶ 19, 21.  As noted, CBP can no longer access "information regarding certain vehicle-related and other violations that only the DMV maintains," including "some aspects of New York residents' criminal history, such as misdemeanor traffic arrests."  *Id.* ¶ 24.  The resulting "gap in information precludes CBP from being able to conduct a full assessment of whether the applicant is considered low risk" because the agency cannot verify the absence of disqualifying factors in an applicant's background, and because the agency loses a critical mechanism for confirming the veracity of information provided in applications for the program.  *Id.*  In light of these impediments to vetting, the Letter merely instructs DHS personnel on the manner in which they are to exercise the agency's discretionary authority to cancel ineligible Global Entry applications while publicly announcing that decision so that New York residents do not submit futile applications.  Whether the agency applied its discretionary determination to each New York resident's application individually or on a group-wide basis, the absence of any judicially manageable standard places the matter beyond the Court's purview. *See Roberts*, 792 F. Supp. 2d at 73–74.

---

[3] The determination whether an individual is a "low-risk traveler" is also analogous to the decision whether a particular case involves "a substantial federal interest[, which] implicates the core [of] prosecutorial discretion."  *In re Sealed Case*, 131 F.3d at 214.  And it involves "the Government's enforcement priorities" that "are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Wayte v. United States*, 470 U.S. 598, 607 (1985).

## II.  The February 5 Letter Is Not Subject To The APA's Notice-And-Comment Requirements.

But even if Plaintiffs had a cognizable APA claim, their claim would still fail on the merits.  The February 5 Letter was not a substantive rule and, even if it were, good cause exempted the agency from engaging in notice-and-comment rulemaking.

### A.  The February 5 Letter Is Exempt From The APA's Rulemaking Requirements Because It Is Not A Substantive Rule.

"An agency action that purports to impose legally binding obligations or prohibitions on regulated parties . . . is a legislative [*i.e.*, substantive] rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (Kavanaugh, J.).  Whether characterized as a policy statement or interpretative rule, the February 5 Letter is not a substantive rule, which exempts it from the APA's notice-and-comment requirements.

### 1. The February 5 Letter Is A General Statement Of Policy.

"The [APA's] notice-and-comment requirements do not apply to . . . 'general statements of policy.'"  *Lincoln*, 508 U.S. at 196.  Such statements are "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Id.* at 197.  A general statement of policy is an "agency action that merely explains how the agency will enforce a statute or regulation — in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  *Nat'l Mining Ass'n*, 758 F.3d at 252.

Because the February 5 Letter "merely explains how the agency will enforce a . . . regulation," *id.*, it is a general statement of policy exempt from the APA's notice-and-comment requirement.  The 2012 Final Rule provides that CBP, "at its sole discretion," can "determine[] that [an] individual . . . is . . . not a low-risk traveler."  8 C.F.R. § 235.12(b)(2).  New York

14

revoked CBP's access to certain information that the agency has, since the inception of Global

Entry more than a decade ago, deemed necessary to fully assess a traveler's low-risk status.

Wagner Decl. ¶ 19.  Faced with this obstacle, the Acting Secretary determined that CBP could no

longer approve Global Entry applications from New York residents in accordance with CBP's

longstanding vetting practices or its regulatory and statutory mandate.  Nor could New York

resident applicants satisfy *their* burden to assure the agency of their low-risk status.  8 C.F.R.

§ 235.12(b)(2)(vii).  Although the agency could have denied or not adjudicated New York

applications one-by-one without publicly announcing the reason, Wagner Decl. ¶ 27, it opted in

favor of greater transparency and consistency by issuing a general statement of policy — that is,

by "advis[ing] the public prospectively on the manner in which the agency proposes to exercise a

discretionary power." *Lincoln*, 508 U.S. at 197.  No notice-and-comment rulemaking was

required to announce this determination.

Plaintiffs observe that the governing regulation "neither excludes New Yorkers from

eligibility for Global Entry, nor provides that an individual's state of residence determines his

eligibility to participate in Global Entry."  Pls.' Mot. 3.  This is beside the point.  Confirming an

applicant's low-risk status is a necessary condition for approval for Global Entry, 8 C.F.R.

§ 235.12(b)(2)(vii), in addition to those conditions Plaintiffs selectively cite.  As a practical

matter, New York State denied its residents the ability to meet that condition by shutting off

CBP's access to information that CBP has long deemed necessary to make a proper risk

assessment.  In other words, the February 5 Letter announced DHS's determination of how it

would apply an existing disqualifying factor for a group of similarly situated applicants going

forward.  New York residency is thus not a new disqualifying criterion but a real-world fact that,

given New York's Green Light Law, precludes a favorable determination of applicants' low-risk

status.

Plaintiffs' claim that they "meet the eligibility criteria set forth in 8 C.F.R. § 235.12" is, therefore, simply untrue.  Pls.' Mot. 6 (citing Statement of Undisputed Material Facts ¶¶ 15, 23).  They do not meet those criteria because, at a minimum, they "cannot satisfy CBP of [their] low-risk status" so long as their driver license and vehicle data remain inaccessible to the agency.  8 C.F.R. § 235.12(b)(2)(vii).  CBP has determined that without these records, it cannot verify either that these applicants provided complete and accurate information about their backgrounds or that these applicants have no records in the DMV database that could disqualify them, whether at the time of their enrollment, re-enrollment, or during the periodic checks CBP conducts after enrollment.  Wagner Decl. ¶¶ 23, 24 (explaining that CBP is no longer able to access real-time information regarding certain vehicle-related and other violations that only the DMV maintains).  The regulation makes clear that the burden is on the applicant to satisfy the agency.  Here, a state-created barrier prevents them from doing so.  Stating that fact publicly does not transform the Letter into a substantive rule.

### 2. The February 5 Letter Could Also Be Understood As An Interpretive Rule.

Even if the February 5 Letter is not a general statement of policy, it is still exempt from notice-and-comment rulemaking as an interpretive rule.  Such rules are "issued by an agency to advise the public of the agency's construction of the statutes and the rules which it administers." *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99 (1995).  "[A]s a general rule, an agency can declare its understanding of what a statute requires without providing notice and comment . . . ." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991).  "A statement seeking to interpret a statutory or regulatory term is, therefore, the quintessential example of an interpretive rule." *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).  And such "an interpretive

statement may 'suppl[y] crisper and more detailed lines than the authority being interpreted' without losing its exemption from notice and comment requirements under § 553." *Id.* (quoting *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). The D.C. Circuit has considered four factors in determining whether a rule is legislative or interpretive:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong.*, 995 F.2d at 1112.  The presence any of these factors can render a rule legislative.  *See id.*  None is present here.

First, the governing regulation itself furnishes more than adequate basis for denying Global Entry applications.  It sets forth applicable standards — including whether an applicant can satisfy CBP of his or her "low-risk status" — that the Letter applies to a particular factual context.  8 C.F.R. § 235.12.  With or without the Letter, CBP had more than sufficient basis to conclude that New York residents could not satisfy the "low-risk status" requirement under the prevailing circumstances.  Second, the agency did not publish the February 5 Letter in the Code of Federal Regulations.  Third, DHS did not invoke its general legislative authority when announcing the impacts of New York's action.  Rather, DHS invoked existing statutory and regulatory authority to reach its conclusions about New York applicants' ability to meet the "low-risk status" requirement.  *Id.*  Fourth, the Letter does not amend a prior legislative rule. Instead, it leaves the regulatory standard for considering discretionary Global Entry approval unchanged and simply "describes the agency's view of the meaning of ["low-risk status" in] an existing . . . regulation," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (finding such a

17

rule interpretive), and in light of events beyond the agency's control.

*      *      *

For all of these reasons, the February 5 Letter cannot be considered a substantive rule and is exempt from notice-and-comment rulemaking.

### B.  The IRTPA Does Not Require Notice-And-Comment Rulemaking.

In addition to invoking the APA, Plaintiffs also contend that the IRTPA itself required the agency to conduct notice-and-comment rulemaking before sending the February 5 Letter. Setting aside that the decision at issue is committed to agency discretion and therefore not reviewable at all, *see* Part I, *supra*, Plaintiffs' argument fails both because the cited provision, § 1365b(k)(3)(C), by its own terms does not apply here, and because the February 5 Letter did not change the criteria for participation in Global Entry.

Section 1365b(k)(3)(C) required the Secretary to "initiate a rulemaking to establish . . . the program" "[w]ithin 365 days after December 26, 2007." The Secretary discharged this obligation over a decade ago by proposing the regulations underlying the Global Entry Program. *See* 73 Fed. Reg. 19,861 (April 11, 2008). By its own terms, this provision has no enduring effect or even relevance. The program it contemplated has been "establish[ed]," and the rulemaking it directed was "initiate[d]" within the long-since-passed specified date. This provision does not even purport to require anything more, let alone impose the kind of eternal notice-and-comment obligation that Plaintiffs envision. This makes sense. The point of the directive was to ensure that the Secretary "complet[ed] a biometric entry and exit data system as expeditiously as possible," as Congress viewed such a system as "an essential investment in efforts to protect the United States by preventing the entry of terrorists." 8 U.S.C. § 1365b(a). Other provisions of the Act reflect the same sense of urgency in standing up programs

recommended by the 9/11 Commission.  *See, e.g.*, § 1365b(c)(1)–(2) (requiring the Secretary to submit a report on the development of "a plan to accelerate the full implementation of an automated biometric entry and exit data system" "[n]ot later than 180 days after December 17, 2004"); § 1365b(e)(1) ("Not later than 2 years after December 17, 2004, the Secretary shall fully integrate all databases and data systems that process or contain information on aliens.").  While important at the time, they are irrelevant now—and cannot possibly be read to impose a free-standing notice-and-comment obligation here.

But even if section 1365b(k)(3)(C) could be read otherwise, it would still not apply to this case.  The February 5 Letter did not alter the underlying regulations, or alter the criteria by which applications for the Global Entry Program are evaluated.  Thus, any latent notice-and-comment obligation in that provision was not triggered by the Letter.

### C.  Even If The February 5 Letter Were A Substantive Rule, Defendants Had Good Cause To Dispense With Notice-And-Comment Rulemaking.

Finally, even assuming the February 5 Letter constituted a substantive rule, the Court should still deny Plaintiffs' motion based on the APA's "good cause" exception.  5 U.S.C. § 553(b)(B).

The "good cause" exception provides that "when the agency for good cause finds . . . that notice and public procedure [] are impracticable, unnecessary, or contrary to the public interest,' the agency need not engage in notice and comment."  *Jifry v. FAA*, 370 F.3d 1174, 1178 (D.C. Cir. 2004) (internal quotations and citation omitted).  The D.C. Circuit has emphasized that the "inquiry into impracticability 'is inevitably fact- or context-dependent.'"  *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).  The court even offered examples that would meet the standard:

For the sake of comparison, we have suggested agency action could be sustained

19

on this basis if, for example, air travel security agencies would be unable to address threats posing a possible imminent hazard to aircraft, persons, and property within the United States, [], or if a safety investigation shows that a new safety rule must be put in place immediately, [], or if a rule was of life-saving importance to mine workers in the event of a mine explosion [].

*Id.* (internal citations omitted).  "The exception excuses notice and comment . . . where delay could result in serious harm."  *Jifry*, 370 F.3d at 1179.  "The Court's review of the 'agency's legal conclusion of good cause is de novo,' although the Court defers to the agency's 'factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious.'"  *Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018) (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014)).

The "good cause" exception applies here.  The circumstances leading to the February 5 Letter are precisely the type of facts and context that render rulemaking impracticable. Immediately upon enactment, New York's Green Light law precluded a thorough vetting of New York residents applying for a TTP.  Wagner Decl. ¶ 24.  As the Acting Secretary explained, "[t]he Act prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history.  As such, the Act compromises CBP's ability to confirm whether an individual applying for TTP membership meets program eligibility requirements."  February 5 Letter at 3; *see also* Wagner Decl. ¶ 24. Yet such vetting is critical before granting approval.  *See* Wagner Decl. ¶ 18 ("The importance of thoroughly vetting the applicants for [TTP] cannot be overstated.").  TTP members enjoy the privilege of facilitated customs clearance, in many cases with very limited interaction with a CBP officer.  *Id.*  A thorough background check ensures that only individuals who present a low risk are approved for membership and that membership is not abused by individuals engaged in criminal activity and attempting to evade detection by CBP officers.  *Id.*  Once CBP was denied

access to DMV records, CBP was disabled from making fully-informed decisions on pending

TTP applications and, therefore, further consideration of the applications was necessarily — and

immediately — halted.

In addition to impracticability, notice-and-comment rulemaking would also have been

contrary to the public interest.  5 U.S.C. § 553(b)(B).  "The public interest prong . . . is

appropriately invoked when the timing and disclosure requirements of the usual procedures

would defeat the purpose of the proposal."  *Mack Trucks, Inc.*, 682 F.3d at 95.  Allowing for a

period of notice and comment would have made no difference because it would not have

reversed the practical effects of the Green Light Law.  It also would have prevented the Acting

Secretary from acting swiftly to ensure that CBP was not faced with the unworkable prospect of

having to adjudicate applications while not being able to satisfy itself of an applicant's low-risk

status, which could have grave consequences if applications were improvidently granted based on

incomplete information.  Wagner Decl. ¶ 18; *see Mack Trucks, Inc.*, 682 F.3d at 95 ("The question is

not whether *dispensing* with notice and comment would be contrary to the public interest, but

whether *providing* notice and comment would be contrary to the public interest.") (emphasis in

original); *see also Nat'l Fed'n of Fed. Emps. v. Devine*, 671 F.2d 607, 611 (D.C. Cir. 1982) ("The

agency's action was required by events and circumstances beyond its control, which were not

foreseen in time to comply with notice and comment procedures.").  Notice-and-comment

rulemaking was thus unnecessary.

## III.    The Court Should Not Vacate The Changes Described In The February 5 Letter Because Any Procedural Error Was Harmless.

The APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C.

§ 706, meaning that if an "agency's mistake did not affect the outcome, if it did not prejudice the

petitioner, it would be senseless to vacate and remand for reconsideration," *PDK Labs. v. DEA*, 362

F.3d 786, 799 (D.C. Cir. 2004).  Thus, "although vacatur is the normal remedy, [courts] sometimes decline to vacate an agency's action . . . .  That decision depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change."  *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 20 (D.D.C. 2017) (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) and *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Here, whether or not DHS *announced* it, the agency reasonably determined that it could not be assured of New York residents' low-risk status given New York State's actions.  *See* Wagner Decl. ¶ 24.  DHS's announcement thus did not affect the outcome it otherwise would eventually reach with respect to each individual application.  If anything, it spared New York resident applicants, like Plaintiffs DiMaio and Fox, from submitting futile applications and paying the non-refundable fee.  Holding that the agency violated the APA by announcing the practical consequence of the New York State's actions instead of quietly applying that consequence to each individual New York resident's Global Entry application would improperly elevate form over substance.

Indeed, Plaintiffs do not argue that CBP can (let alone should) approve applicants when the agency is unable to determine their low-risk status.  *See* Pls.' Mot. at 2 (describing remedy as an order to vacate the February 5 Letter for failure to engage in notice-and-comment rulemaking).  But the logical conclusion of Plaintiffs' argument is that, even if the agency were to conduct notice-and-comment rulemaking, CBP should ultimately be forced to disregard the absence of verified DMV data that CBP has deemed necessary to make a low-risk determination.  *Id.* at 11 ("Had Defendants followed the process here, interested persons and groups would have had the opportunity to demonstrate through the submission of comments

that DHS's ban on New Yorkers was unjustifiable for a variety of reasons.").  Such relief, if

granted, would run directly against the regulation's mandate that *the agency*, in its "sole

discretion," make that determination before an applicant may be approved.  8 C.F.R.

§ 235.12(b)(2).  The outcome of each New Yorker's application remains the same with or

without the February 5 Letter: without the DMV data, they cannot assure CBP of their low-risk

status and are therefore not entitled to participate in Global Entry.  It would be "senseless to

vacate and remand for reconsideration" when that same result necessarily attains until CBP's

access to New York DMV data is restored.  *PDK Labs.*, 362 F.3d at 799.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' partial motion for summary

judgment.

Dated:  April 6, 2020                                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Dena M. Roth*
DENA M. ROTH (DC Bar # 1001184)
CHARLES E.T. ROBERTS (PA Bar # 326539)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 11204
Washington, DC 20005
Tel: (202) 514-5108
Facsimile: (202) 616-8460
Email: dena.m.roth@usdoj.gov

*Counsel for Defendants*