# DEFENDANTS' EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN DIMAIO, et. al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CHAD WOLF, in his official capacity as ) <br> the Acting Secretary of Homeland Security, ) <br> et. al., ) <br> ) <br> Defendants. ) | Case No. 1:20-cv-00445 |

## DECLARATION BY JOHN P. WAGNER

I, John P. Wagner, hereby state as follows:

1. I am the Deputy Executive Assistant Commissioner, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS). I have been employed in this role since April 16, 2014. I began my career with the U.S. Customs Service as a Customs Inspector in 1991, and I had several assignments in the field, including at the New York/New Jersey seaport and the Laredo port of entry. I was also detailed to the Department of Homeland Security, Border and Transportation Security Directorate from 2003 to 2004. I have been assigned to the Office of Field Operations at Headquarters since 1999. I have worked on many different policy and operational issues during my time at headquarters, including serving as Executive Director, Admissibility and Passenger Programs.

2. In my role as the Deputy Executive Assistant Commissioner, I am responsible for executing the missions of CBP and OFO. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and

the enforcement of hundreds of laws at the border on behalf of numerous federal agencies. OFO is the primary CBP office responsible for securing the U.S. border at ports of entry (POEs) while facilitating lawful trade and travel. In my position, I supervise more than 28,000 employees at 20 major field offices, 328 POEs, and 70 locations in over 40 countries internationally.

3. As Deputy Executive Assistant Commissioner, I am familiar with CBP's administration and enforcement of legal requirements at the border, including the enforcement and administration of immigration laws, and the inspection, processing, and admission of persons who seek to enter or depart the United States. In my position, I also oversee the administration of various programs and initiatives that facilitate travel and trade, including CBP's Trusted Traveler Programs.

4. I am familiar with the complaint filed in *Dimaio, et al. v. Wolf*, Case No. 1:20-cv-00445, filed in the United States District Court for the District of Columbia and plaintiffs' claims therein.

5. The purpose of this declaration is to provide an operational background for the February 5, 2020 letter from Acting Secretary Wolf to New York State (February 5 Letter) announcing that New York residents are no longer eligible to enroll or re-enroll in CBP's Trusted Traveler Programs because New York State terminated CBP's access through National Law Enforcement Telecommunications System (Nlets)[1] to information maintained by the New York State Department of Motor Vehicles (DMV) pursuant to the

---

[1] Nlets is an interstate network where law enforcement, criminal justice, and public safety-related information is shared between states, as well as with the federal government, pursuant to agreed upon terms of use. Additional information on Nlets is available at www.nlets.org.

New York Driver's License Access and Privacy Act,[2] also known as the "Green Light" Law.

6. This declaration is based on my personal knowledge, as well as information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

### A. Trusted Traveler Programs Operated by CBP

7. The Admissibility and Passenger Programs Office (APP) within OFO is responsible for overseeing the Trusted Traveler Programs Office. The Trusted Traveler Programs Office is responsible for operation of all aspects of the Trusted Traveler Programs, such as determining policy for eligibility, approving and denying Trusted Traveler applications, and revoking existing memberships.

8. A Trusted Traveler Program is a voluntary membership program operated by CBP that provides pre-approved, low-risk travelers with facilitated processing into the United States through dedicated lanes and kiosks. CBP operates the following Trusted Traveler Programs: Global Entry, NEXUS, Secure Electronic Network for Travelers Rapid Inspection (SENTRI), as well as the trusted traveler/trusted shipper program, Free and Secure Trade (FAST) for commercial drivers.

9. Enrollment in these programs enables CBP to expedite the inspection and security vetting process for low-risk travelers, allowing CBP to focus resources toward providing additional scrutiny to individuals who present a higher risk. Low-risk travelers are directed to dedicated lanes or kiosks at airports, as applicable, for facilitated processing resulting from CBP's pre-approval activities (unless the traveler has items to declare,

---

[2] N.Y. Veh. & Traf. § 201 (2019).

there is a specific enforcement issue to address, or he/she is chosen for a selective or random secondary referral for further processing).

10. Global Entry allows for facilitated clearance of pre-approved, low-risk international air travelers through participating U.S. airports. All individuals who apply for Global Entry membership must undergo a rigorous background check and an interview conducted by a CBP officer. Global Entry members who register their vehicles with CBP may use the dedicated SENTRI lanes when entering the United States from Mexico, and NEXUS lanes when traveling between Canada and the United States.

11. NEXUS allows members traveling between the United States and Canada to take advantage of facilitated processing by U.S. and Canadian officials through dedicated processing lanes at Canadian preclearance airports and at designated northern border POEs and marine reporting locations. NEXUS is a reciprocal program that requires that applicants be interviewed by officers from both CBP and the Canada Border Services Agency (CBSA) and approved independently by each agency. NEXUS members may use Global Entry kiosks when entering the United States by air.

12. SENTRI members have the benefit of access to dedicated primary lanes that allow facilitated entry from Mexico at designated U.S. southern border POEs. SENTRI applicants also voluntarily undergo a thorough background check against law enforcement databases and a personal interview with a CBP officer.

13. FAST allows members to enter the United States by land and affords facilitated processing at designated U.S. land POEs to approved commercial truck drivers who make fully qualified FAST trips between the United States and Canada, from Mexico to the United States, and from Mexico through the United States to Canada. In addition to the

vetting requirement for commercial truck drivers, each company whose cargo the driver is carrying is also vetted.

14. All applicants for Trusted Traveler Program memberships must complete and submit an online application and submit payment of a non-refundable application fee.  CBP reviews the applicant's information for processing and checks the information against various government databases.  *See infra ¶* 20.  Following initial vetting by CBP, applicants that are conditionally approved may be directed to schedule an in-person interview. The final approval for program membership is contingent on the final decisions regarding the vetting of the application, the submission of fingerprints, and the results of the interview. The memberships are valid for five years, after which the member must re-apply and undergo additional vetting.  In addition, all members are vetted against law enforcement databases on a recurrent basis.

15. Eligibility criteria for Trusted Traveler Programs are set forth by regulation and Federal Register Notices, and are published on the CBP website.[3]

16. Absent any disqualifying factors, Trusted Traveler Programs are open to U.S. citizens, U.S. nationals, and U.S. lawful permanent residents (LPRs), as well as certain non-immigrant aliens from countries that have entered into arrangements with CBP.

17. Individuals are ineligible to participate in Trusted Traveler Programs if CBP, at its sole discretion, determines that the traveler is not a sufficiently low-risk traveler or otherwise does not meet program requirements.  An individual may meet application eligibility criteria, *i.e.*, be a U.S. citizen or an LPR and possess a valid passport, but may not qualify

---

[3] *See* 8 C.F.R. § 235.12; Utilization of Global Entry Kiosks by NEXUS and SENTRI Participants, 75 Fed. Reg. 82202, December 29, 2010; Announcement of Trusted Trader Program Test, 79 Fed. Reg. 34334, June 16, 2014. Current program eligibility requirements for SENTRI are found at http://www.cbp.gov/travel/trusted-traveler-programs/sentri.

for membership based on a risk assessment. The disqualifying factors include but are not limited to:

(i) The applicant provides false or incomplete information on the application;

(ii) The applicant has been arrested for, or convicted of, any criminal offense or has pending criminal charges or outstanding warrants in any country;

(iii) The applicant has been found in violation of any customs, immigration, or agriculture regulations, procedures, or laws in any country;

(iv) The applicant is the subject of an investigation by any federal, state, or local law enforcement agency in any country;

(v) The applicant is inadmissible to the United States under applicable immigration laws or has, at any time, been granted a waiver of inadmissibility or parole;

(vi) The applicant is known or suspected of being or having been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism; or

(vii) The applicant cannot satisfy CBP of his or her low-risk status or meet other program requirements.

Additional information about how CBP determines what is a disqualifying factor cannot be disclosed publicly without causing harm to law enforcement and national security interests.

18. Approximately 9.5 million travelers are currently enrolled in CBP's Trusted Traveler Programs. The importance of thoroughly vetting the applicants for Trusted Traveler Programs cannot be overstated. Trusted Traveler Program members enjoy the privilege of expedited customs and, as applicable, immigration clearance, in many cases with very

limited interaction with a CBP officer. A thorough background check ensures that only individuals who present a low risk are approved for membership and the membership is not taken advantage of by those individuals engaged in criminal activity or attempting to evade detection by CBP officers.

19. Since the inception of the Global Entry program in 2008,[4] CBP has determined whether the applicant meets eligibility requirements for membership by conducting an in-person interview and checking the information supplied by the applicant against various law enforcement databases, including DMV records, which is necessary in order to verify whether, *inter alia*, an applicant has any prior arrests or convictions, pending charges, or is under investigation by any federal, state, or local law enforcement agency. If CBP determines that an applicant is not qualified for membership, CBP will deny the application. Further, CBP conducts periodic checks for all enrolled members and will revoke an individual's membership if CBP becomes aware that disqualifying factors exist for a current Trusted Traveler Program member (*e.g.*, a member gets arrested). The denial of an application or revocation of membership alone has no effect on the individual's ability to travel internationally.

20. CBP conducts checks against the following databases: TECS[5] (not an acronym), for historical enforcement records; Federal Bureau of Investigation (FBI) databases for criminal history background information, which involves submission of fingerprints; National Crime Information Center for wants and warrants; Terrorist Screening Database;

---

[4] *See* Announcement of Program Pilot: International Registered Traveler (IRT) 73 Fed. Reg. 19861 (April 11, 2008) and Establishment of Global Entry Program, 74 Fed. Reg. 59932 (November 19, 2009).
[5] *See* DHS/CBP/PIA-009(a) TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative (August 5, 2011), available at www.dhs.gov/privacy.

    Department of State records for alien records lookouts and status indicators; and Automated Biometric Identification System (IDENT) for immigration-related records.

21. In addition to the above databases, CBP consults Nlets for driver license and vehicle data. CBP does so regardless of whether the Trusted Traveler applicant has provided driver license information or whether the applicant has indicated that he or she has a driver license by using other information that the applicant provides, such as his/her address. This permits CBP to validate the applicant's identity and to identify certain information pertaining to vehicle-related violations, even from jurisdictions where the applicant is not licensed. Driver license and vehicle data allow CBP to detect information regarding violations that the applicant has failed to disclose, which could include driving without a license. Along with the information obtained from other law enforcement databases listed above, driver license and vehicle data help CBP develop a complete picture of an individual's background and determine whether that individual satisfies the low-risk status requirement for membership.

22. CBP provides notice to individuals applying for CBP's Trusted Traveler Programs that CBP conducts checks against the databases discussed above, through the application website, as well as various publicly available Privacy Impact Assessments and Systems of Records Notices (SORNS) that CBP has published. *See* Appending A. By submitting the application, the applicants provide consent to CBP to conduct these checks.[6]

            **B.**       **Impact of the New York State Law**

---

[6] *See* DHS/CBP/PIA-002 Privacy Impact Assessment, Global Enrollment System, January 2013, *available at* https://www.dhs.gov/publication/global-enrollment-system-ges; DHS/CBP/PIA-002 Privacy Impact Assessment, April 2006, at p.6, *available at* https://www.dhs.gov/publication/global-enrollment-system-ges (demonstrating that CBP has notified the public that it conducts checks against DMV records through Nlets since the inception of the Global Entry program). Privacy Act of 1974, System of Records, 85 Fed. Reg. 14214, March 11, 2020.

23. On December 12, 2019, pursuant to New York's "Green Light" Law, New York took action to deny CBP access through Nlets to information maintained by the DMV. Prior to December 12, CBP was able to access real-time driver license and vehicle data from New York through Nlets. As a result of the changes New York implemented pursuant to the "Green Light" Law, when CBP queries Nlets for information pertaining to an individual with a New York residence, CBP is no longer able to view that individual's driver license and vehicle data. Currently, New York is the only state that has terminated CBP's access to driver license and vehicle data via Nlets, impacting its vetting of Trusted Traveler Program application.

24. Without access to driver license and vehicle data, CBP does not have complete information about an applicant for Trusted Traveler Programs. Specifically, CBP is no longer able to access information regarding certain vehicle-related and other violations that only the DMV maintains. While CBP is still able to view certain criminal vehicle-related violations that are reflected in other federal law enforcement databases, non-criminal driver license and vehicle data about New York residents, as well as some aspects of any New York applicant's criminal history, such as misdemeanor traffic arrests, are only available through the New York DMV feed to Nlets. In addition, CBP checks the information obtained through Nlets against other law enforcement databases available to CBP to determine whether the applicant presents a risk. Such a gap in information precludes CBP from being able to conduct a full assessment of whether the applicant is considered low risk. This is true even if the applicant does not have a driver license, because individuals without driver licenses could still have a record of violations with the DMV (*e.g.*, driving without a license).

25. At this time, for purposes of vetting Trusted Traveler Program applicants, CBP is unable to obtain, from any source, an up-to-date feed for driver license and vehicle data that the New York DMV maintains. While the "Green Light" Law contains an exception for providing access to DMV information pursuant to a court order, it is unclear whether background vetting would be grounds for obtaining such an order under that law. As of February 5, 2020, over 80,000 New York residents had pending Trusted Traveler Program applications.[7] Even if court orders for background vetting were allowed, undertaking such a process for each application would take months, and be immensely burdensome, inefficient, and extremely impractical for purposes of vetting Trusted Traveler Program applicants. In addition, CBP would only obtain historical, not current, information pursuant to a court order. An average application takes up to seven months to process due to the large number of applications CBP receives. This additional process, which, if allowed, would be required for all New York resident applications, would further delay processing of all applications.

26. Even if an applicant were to provide CBP with a copy of his/her driver license and vehicle data that the applicant obtained from the New York DMV, such information would only reflect historical information, instead of up-to-date data, and CBP would not have any means to validate that such information is accurate. Further, if CBP were to receive such information from a third party, CBP would not be able to validate that the information is accurate or up-to-date. Finally, any other alternative method of obtaining the information maintained by the DMV that would not provide CBP with current information that returns results in a matter of minutes, would be impracticable and

---

[7] CBP cancelled all applications by New York residents that were pending as of February 5, 2020, and issued refunds.

burdensome for the Trusted Traveler Programs Office and operationally insufficient to facilitate the necessary risk assessments.

27. Without access to the information maintained by the New York DMV, CBP can no longer fully vet any Trusted Traveler Program applicant with a New York residence. As a result, all pending Trusted Traveler Program applications for current New York residents were cancelled as those individuals could no longer satisfy CBP of their low-risk status because CBP could not process any of their applications without the driver license and vehicle data. The decision to cancel all the applications instead of making decisions on an individual application basis was an operational one and was made because the reason for cancellation was the same for all applications. Cancellation (as opposed to issuing denials of the applications one by one) also allowed CBP to issue refunds. Finally, had CBP denied the applications, rather than cancelled them, a "denial" would have been recorded in the system that would appear on any future Trusted Traveler Program application submitted by the individual.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on the 2 day of April, 2020

/s/ _____
John P. Wagner
Deputy Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection

11

**APPENDIX A**

Figure 1: Login.gov Disclaimer



12

Figure 2:  Acknowledgement of Application Requirements



Figure 3:  Privacy Act Statement

- Select "○ **Yes**".

