**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JONATHAN DIMAIO, et al., | |
| *Plaintiffs*, | |
| v. | Case No.  1:20-cv-00445 |
| CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security, et al., | |
| *Defendants*. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINITFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.   The Decision Whether to Engage in Notice-and-Comment Rulemaking Is Not
     Committed to Agency Discretion by Law .................................................................. 3

II.  The February 5 Rule is a Legislative Rule and was Therefore Required to be
     Promulgated under the APA's Notice-And-Comment Procedures ......................... 6

III. The Government Cannot Invoke the APA's Good Cause Exception For the First
     Time In Court, and no Good Cause Existed in any Event .................................... 13

IV.  The Government's Failure to Engage in Notice-And-Comment Rulemaking
     Was Not Harmless .................................................................................................. 17

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. C.A.B.*,
   713 F.2d 795 (D.C. Cir. 1983) ................................................................................. 16

*Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
   663 F.3d 476 (D.C. Cir. 2011) ........................................................................... 16, 18

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*,
   665 F.2d 1153 (D.C. Cir. 1981) .............................................................................. 13

*Am. Hosp. Ass'n v. Bowen*,
   834 F.2d 1037 (D.C. Cir. 1987) ........................................................................... 9, 10

*Am. Medical Ass'n v. Reno*,
   57 F.3d 1129 (D.C. Cir. 1995) .................................................................................. 3

*Association of Flight Attendants-CWA, AFL-CIO v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) ............................................................................... 6, 7

*Chamber of Commerce v. OSHA*,
   636 F.2d 464 (D.C. Cir. 1980) ................................................................................ 10

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) .................................................................................. 6

*Council of S. Mountains, Inc. v. Donovan*,
   653 F.2d at 580 (D.C. Cir. 1981) ....................................................................... 14, 16

*Delta Air Lines, Inc. v. Export-Import Bank*,
   718 F.3d 974 (D.C. Cir. 2013) .................................................................................. 4

*Gen. Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002) ................................................................................ 11

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................. 4

*Ivy Sports Medicine, LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014) .................................................................................. 19

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................................. 3

*Mach Mining, LCC v. EEOC,*
   135 S. Ct. 1645 (2015) .......................................................................................... 4

*Mack Trucks, Inc. v. EPA,*
   682 F.3d 87 (D.C. Cir. 2012) ............................................................................. 14

*McLouth Steel Prods. Corp. v. Thomas,*
   838 F.2d 1317 (D.C. Cir. 1988) ........................................................................... 6

*Molycorp, Inc. v. EPA,*
   197 F.3d 543 (D.C. Cir. 1999) ............................................................................. 6

*Nat. Res. Def. Council v. Thomas,*
   805 F.2d 410 (D.C. Cir. 1986) ........................................................................... 12

*Nat'l Venture Capital Ass'n v. Duke,*
   291 F. Supp. 3d 5 (D.D.C. 2017) ....................................................................... 13

*Natural Res. Defense Council v. Wheeler,*
   No. 18-1172 (D.C. Cir. Apr. 7, 2020) ...................................................... 9, 10, 16

*Roberts v. Napolitano,*
   792 F. Supp. 2d 67 (D.D.C. 2011) ....................................................................... 5

*Safari Club Int'l v. Zinke,*
   878 F.3d 316 (D.C. Cir. 2017) .................................................................. 16, 17, 18

*Serrato v. Clark,*
   486 F.3d 560 (9th Cir. 2007) ............................................................................... 3

*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ........................................................................... 14

*Steenholdt v. FAA,*
   314 F.3d 633 (D.C. Cir. 2003) ............................................................................. 5

*Sugar Cane Growers Coop. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ............................................................................. 17

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) .......................................................................... 9, 10

*Tenn. Gas Pipeline Co. v. FERC,*
   969 F.2d 1141 (D.C. Cir. 1992) ......................................................................... 13

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................ 7

*United States v. Ross*,
    848 F.3d 1129 (D.C. Cir. 2017) ............................................................ 13, 14

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
    139 S. Ct. 361 (2018) ................................................................................... 5

**Statutes**

5 U.S.C. § 553 ................................................................................................ 4, 13

5 U.S.C. § 706 .................................................................................................... 4

8 U.S.C. § 1365b ..................................................................................... 5, 9, 11

**Treatises**

Wright & Miller, 32 Fed. Prac. & Proc. § 8154 (Aug. 2019) ........................... 6

**Regulations**

8 C.F.R. 8 § 235.12 ................................................................................. 5, 10, 11

## INTRODUCTION

Without any advance notice, the Department of Homeland Security abruptly terminated the rights of nearly 20 million New Yorkers to apply for Global Entry and other Trusted Traveler programs (TTPs) by mailing a two-and-half-page letter to New York state officials (the "February 5 Rule").  DHS's action is unlawful because the agency failed to follow the Administrative Procedure Act's notice-and-comment rulemaking procedures.

The Government offers a kitchen-sink response seeking to invoke every conceivable exception to the APA's notice-and-comment requirements.  But each of its arguments is flatly contrary to black-letter principles of administrative law and binding circuit precedent.  The Government principally asserts that its decision to bypass rulemaking is unreviewable because DHS's TTP eligibility determinations are committed to agency discretion by law.  But it is well-settled that the decision to forgo notice-and-comment rulemaking is *never* committed to agency discretion by law, regardless of whether a court can review the substance of the agency's decision. *Am. Medical Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995).  In any event, DHS's rules establishing TTP eligibility *criteria*, like the February 5 Rule, are reviewable even if the agency's individual TTP eligibility *determinations* are not.

The Government next asserts that the February 5 Rule is either a general statement of policy or an interpretive rule. The Government's hesitancy to commit to one theory or the other is unsurprising—neither fits.  Policy statements must afford agency decisionmakers with discretion in individual cases; the February 5 Rule does the opposite by categorically barring all New Yorkers from even applying for TTPs, without exception.  And interpretive rules must actually interpret statutory or regulatory language, and cannot change existing rights or obligations.  Nowhere in the February 5 Rule did DHS cite any such language that it was purportedly interpreting.  And the

February 5 Rule plainly modifies the existing eligibility criteria for Global Entry and other TTPs by barring New Yorkers from applying for these programs in the first instance.

As last resorts, the Government seeks to invoke the "good cause" exception to notice-and-comment and the APA's "harmless error" provision.  But the Government cannot invoke the "good cause" exception for the first time in court.  The APA requires the agency to "incorporate[ ] the [good cause] finding and a brief statement of reasons therefor *in the rule[ ] issued*."  5 U.S.C. § 553(b)(B) (emphasis added).  DHS did no such thing.  Moreover, "good cause" is reserved for emergency situations.  This is not one.  As for the Government's "harmless error" argument, the D.C. Circuit has made emphatically clear that an agency's "utter failure to comply with notice and comment" is not harmless error.  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 335 (D.C. Cir. 2017).

Federal agencies wield enormous power over the lives of all Americans.  They are not and should not be permitted to employ this power arbitrarily at the stroke of a pen.  The APA thus prohibits agencies from promulgating rules without providing interested parties with notice and an opportunity to comment.  While "somewhat burdensome," these notice-and-comment procedures "help[] to prevent mistakes" and "ensure[] that regulated parties"—here, some 20 million New Yorkers—"receive fair treatment, a value basic to American administrative law."  *Ivy Sports Medicine v. Burwell*, 767 F.3d 81 87-88 (D.C. Cir. 2014) (Kavanaugh, J.).  Enforcement of these basic procedural guarantees is all the more important when an agency takes action that affects every single person who lives in the fourth most populous state in the nation.

Plaintiffs understand that, under the district-wide standing order, the April 14 hearing has been canceled unless this Court orders it to proceed telephonically.  Plaintiffs are available for a telephonic hearing on April 14 or at the Court's earliest convenience, and believe that there is no reason to delay adjudicating the pending motion for partial summary judgment.

## ARGUMENT

I.    **The Decision Whether to Engage in Notice-and-Comment Rulemaking Is Not Committed to Agency Discretion by Law**

The Government's lead argument is foreclosed by binding D.C. Circuit precedent that the Government fails even to acknowledge.  The Government argues that "DHS's determination regarding global entry applications from New York residents is unreviewable because such determinations are committed to agency discretion by law."  Opp. Br. 9-13.  Whether or not that is true (and it is not), it makes no difference because *procedural* flaws in agency action are never unreviewable.

Plaintiffs' partial summary judgment motion exclusively challenges DHS's failure to follow the APA's notice-and-comment procedures in issuing the February 5 Rule.  It does not challenge the substantive lawfulness of the agency's action.  *See* Pls. Br. 7-10.  And as the D.C. Circuit has made clear, "under the APA the ultimate availability of substantive judicial review is *distinct* from the question of whether the basic rulemaking strictures of notice and comment and reasoned explanation apply."  *Am. Medical Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) (emphasis in original).  Rejecting the notion that the decision whether to engage in notice-and-comment rulemaking could be "committed to agency discretion by law," *American Medical Association* explained that "[t]he APA's procedural requirements are enforceable apart from the reviewability of the underlying action, and, indeed, support several important functions apart from judicial review."  *Id.*  For example, notice-and-comment rulemaking "helps to ensure that the rule is subjected to thoroughgoing analysis and critique by interested parties and the agency," "helps maintain public accountability," and "enables a petitioner to file a meaningful petition for reconsideration."  *Id.*

The D.C. Circuit's ruling in *American Medical Association* relied on the Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182 (1993), which held that while the substance of an agency's allocation of funds was "committed to agency discretion by law," a procedural challenge to that decision was not. *Id.* at 193, 195-99. The Court explained that, "quite apart from the matter of substantive reviewability," it still needed to address the question of whether the agency "was required to abide by the familiar notice and comment procedures of the APA." *Id.* at 195; *see also Serrato v. Clark*, 486 F.3d 560, 569 (9th Cir. 2007) ("An agency's obligation to comply with the APA's notice and comment provisions is an administrative requirement that must be fulfilled, notwithstanding whether an agency's action is susceptible to judicial review.").

Nothing in the Government's opposition addresses whether the decision *to forgo notice-and-comment rulemaking* is committed to agency discretion by law. The Government cites no case where a court has held as much. *See* Opp. Br. 9-13. None exists as far as Plaintiffs are aware, and it is easy to see why. The "committed to agency discretion by law" exception to APA review is "very narrow," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and carries with it a "strong presumption favoring judicial review of administrative action," *Mach Mining, LCC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quotation marks omitted). "The mere fact that a statute grants broad discretion does not render the agency's decisions completely nonreviewable under [this] exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Delta Air Lines, Inc. v. Export-Import Bank*, 718 F.3d 974, 977 (D.C. Cir. 2013) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985)). In sum, the exception applies only where there is "no law to apply." *Heckler*, 470 U.S. at 822. But here there *is* law to apply: The APA requires agencies to follow notice-and-comment procedures when promulgating legislative rules, and requires courts to "hold unlawful and set aside

agency action, findings, and conclusions found to be … without observance of procedure required by law." *See* 5 U.S.C. §§ 553, 706(2)(D). Under *American Medical Association* and *Lincoln*, the Government categorically cannot invoke the committed to agency discretion by law exception as a defense to this motion.

There is a separate question whether Plaintiffs' *substantive* challenge to the February 5 Rule, set forth in Counts II and III of the Complaint, *see* Compl. ¶¶ 80-88, is committed to agency discretion by law. Although that is the only question the Government actually addresses in its motion, it is irrelevant and premature, and the Court need not address it now. To be clear, however, this exception does not apply to Plaintiffs' substantive challenge either because the Court has ample law to apply from the APA itself and the governing statute and regulations. DHS determined that all New Yorkers are no longer eligible even to apply for Global Entry and other TTPs despite Congress's insistence that these programs "include[] as many participants as practicable," 8 U.S.C. § 1365b(k)(3)(E); despite the governing regulation's provision that all "U.S. citizens, U.S. nationals, and U.S. lawful permanent residents" "may *apply* to participate in Global Entry," 8 C.F.R. § 235.12(b)(2) (emphasis added); and despite the governing regulation's framework requiring DHS to make "*individual*" "risk determinations" in assessing whether an "applicant" is ultimately ineligible, *id.* (emphasis added).

These provisions, along with the APA's familiar arbitrary and capricious standard, create law for this Court to apply in evaluating whether the agency lawfully barred *all* New Yorkers from applying for Global Entry. *See Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (explaining that the relevant "law to apply" "may be found in formal and informal policy statements and regulations as well as in statutes"). The Government points to no statutory language here that is remotely analogous to the statutory language at issue in the few "rare circumstances" where courts

have concluded that agency actions were committed to agency discretion by law and that the APA's standards did not apply.  *See, e.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361, 370 (2018).  The mere fact that the statute governing TTPs requires the Secretary to establish "criteria," Opp. Br. 11, hardly means that those criteria may be arbitrary or inconsistent with the statutory and regulatory scheme.

The Government relies on *Roberts v. Napolitano*, 792 F. Supp. 2d 67 (D.D.C. 2011), but that was a case where the Court held that DHS's determination as to an *individual* applicant's ability to participate in Global Entry was committed to agency discretion.  It had nothing to do with the agency's establishment of the generally applicable criteria for *applying* for Global Entry in the first instance.  Were the Court to accept the Government's position that its decision to bar entire categories of persons from applying for TTPs is not subject to judicial review, it would give DHS the power to effectively end the Global Entry program on a whim.  DHS could simply assert that no individuals could satisfy the agency of his or her low-risk status, and—according to DHS— that decision would not be subject to judicial review.

## II.    The February 5 Rule Is a Legislative Rule and Was Therefore Required to be Promulgated under the APA's Notice-And-Comment Procedures

The Government alternatively argues that the February 5 Rule is not subject to notice-and-comment rulemaking because it is either a general statement of policy, Opp. Br. 14, or an interpretive rule, *id.* at 16.  It is neither.

**A.**    The "primary distinction between a substantive rule … and a general statement of policy … turns on whether an agency intends to *bind itself* to a particular legal position." *Molycorp, Inc. v. EPA,* 197 F.3d 543, 546 (D.C. Cir. 1999) (citation omitted) (emphasis added). This inquiry focuses on whether the challenged action "genuinely leaves the agency and its decisionmakers free to exercise discretion."  *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d

1317, 1320 (D.C. Cir. 1988).  Indeed, "[f]or many courts … the critical factor for determining whether the new policy constitutes an excepted statement is whether it left the agency officials free to exercise discretion in an individual case."  Wright & Miller, 32 Fed. Prac. & Proc. § 8154 (Aug. 2019).  A statement of policy "may not have a present effect," and must "genuinely leave[] the agency and its decisionmakers free to exercise discretion." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (quoting *Am. Bus Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980)).

For example, the D.C. Circuit evaluated what it called an "archetypal" general statement of policy in *Association of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015).  The case involved a document from the Federal Aviation Administration providing guidance to its safety inspectors on how to evaluate airlines' carry-on baggage programs. *Id.* at 714.  The Court explained that this guidance document was a classic policy statement because it "apprise[d] the public of the agency's intentions" and "inform[ed] the decisions of those who exercise the agency's discretion." *Id.* at 717.  Specifically, the document "instructs aviation safety inspectors on what to look for when evaluating revised carry-on baggage programs, but it does not limit their discretion.  In other words, the document as a whole does not read as a set of rules." *Id.* (quotations omitted).  "Similarly, the [document] does not mandate specific changes to carry-on baggage programs" and instead "preserves the aviation inspectors' discretion to evaluate" the sufficiency of these programs "in an individual case." *Id.*

Under the D.C. Circuit's case law, the February 5 Rule is substantive, and not a general statement of policy.  The February 5 Rule does not "leave[ ] the agency and its decisionmakers free to exercise discretion" in deciding whether to consider the TTP applications of New Yorkers. *Young*, 818 F.2d at 946.  In fact it does the exact opposite: it has the "present effect," *id.*, of

eliminating this discretion altogether by categorically barring the agency and its decisionmakers from even considering New Yorkers' TTP applications—as DHS's immediate cancellation of thousands of pending applications confirms. *See* Defs.' Response to Pls. Statement of Facts ¶¶ 3, 8-9, 35 (admitting that the letter bans all New Yorkers from applying for Global Entry and that DHS as a result cancelled all pending applications by New Yorkers, including Plaintiff Jocardo Ralston). Far from being a general statement of policy to guide the agency's discretion in future TTP application decisions, it is a legislative rule that rescinds the ability of New Yorkers to participate in the program in the first place. *See Texas v. United States*, 809 F.3d 134, 171-76 (5th Cir. 2015) (holding that a memorandum purporting to guide DHS's enforcement discretion with respect to parents of certain immigrant children was a legislative rule because it was "binding as a practical matter").

In the Government's brief effort to justify the rule as a "general statement of policy," Opp. Br. 14-16, it never even attempts to grapple with the key governing standards. The Government does not argue that the February 5 Rule lacks "present effect." *Cmty. Nutrition Inst.*, 818 F.2d at 946. The Government does not argue that decisionmakers within the agency are "free to exercise discretion." *Id.* The Government states that DHS "has determined" that no New Yorker can satisfy the regulatory criteria and that "[s]tating that fact publicly does not transform the Letter into a substantive rule." Opp. Br. 16. But Plaintiffs do not contend that the *public* nature of DHS's determination is what makes the rule substantive; on the contrary, an internal email outlining the same determination would have been a substantive rule too. It is *making the determination* at the agency-wide level, and depriving every decisionmaker within DHS of the ability to exercise their discretion to evaluate risk, that constitutes the substantive rule.

What's more, the February 5 Rule is clearly legislative because DHS considers it a binding directive.  DHS's own press release—still available on DHS's website—offers the agency's own characterization of the February 5 Rule.  According to the press release:

> In response to New York State implementing the Driver's License Access and Privacy Act (Green Light Law), Acting Secretary Chad F. Wolf announced New York residents *will no longer be eligible* to apply for or renew their enrollment in certain Trusted Traveler Programs like Global Entry…. The Acting Secretary informed State officials by letter of the change.  The letter may be read here.

> "New York's 'Green Light Law' is ill-conceived and *the Department is forced to take this action* to ensure the integrity of our Trusted Traveler Programs. It's very clear: this irresponsible action has consequences," said Acting Secretary Chad Wolf….

DHS, *Department of Homeland Security Suspends New Enrollment/ReEnrollment in CBP Trusted Traveler Programs for New York Residents*, Feb. 6, 2020, http://archive.is/dvw3U (last accessed Apr. 9, 2020) (emphasis added).  According to DHS itself, the Rule was an "action" it needed to "take" to make New York residents "no longer … eligible" for TTPs.  It was the *very definition* of a substantive legislative rule.

**B.**      The Government next says that the February 5 Rule "could also be understood as an interpretive rule" instead of a legislative rule.  Opp. Br. 16.  But this argument is similarly meritless.   Legislative rules "are ones which grant rights, impose obligations, or produce other significant effects on private interests, or which effect a change in existing law or policy."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (internal citations and quotation marks omitted).  "Interpretive rules, by contrast, are those which merely clarify or explain existing laws or regulations, are essentially hortatory and instructional, and do not have the full force and effect of a substantive rule."  *Id.* (internal citations and quotation marks omitted).  Put another way, agency action is a legislative rule if it "adds content to the governing legal norms" that "Congress has devised."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 (D.C. Cir. 1997); *see also Bowen*,

834 F.2d at 1045 (explaining that courts have "sought to distinguish cases in which an agency is merely explicating Congress' desires from those cases in which the agency is adding substantive content of its own").

The February 5 Rule bears the defining characteristic of a legislative rule—it "adds content to the governing legal norm[]." *Syncor*, 127 F.3d at 96. Congress directed DHS to ensure that TTPs like Global Entry "include[] as many participants as practicable," 8 U.S.C. § 1365b(k)(3)(E), and New Yorkers were free to apply for TTPs prior to the February 5 Rule. But DHS determined that it was necessary to rescind the right of every New York resident to apply for these programs in light of the purported practical consequences of New York's Green Light Law. "That manner of action—identifying a practical problem … and relying on agency expertise to put forward a new and different resolution—is quintessentially legislative, manifesting [the agency's] intent to exercise its delegated legislative power and speak with the force of law." *Natural Res. Defense Council v. Wheeler*, No. 18-1172, slip op. at 22 (D.C. Cir. Apr. 7, 2020) (explaining why a 2018 EPA rule was a legislative rather than interpretive rule). The categorical bar on participation is not only brand new, but, as the Government does not dispute, it has "significant effects on private interests" by terminating the eligibility of nearly 20 million New Yorkers. Opp. Br. 16-17.

The February 5 Rule is also a substantive rule rather than an interpretive rule because it "effect[s] a change in existing law or policy," *Bowen*, 834 F.2d at 1045, something the Government does not even dispute. *See* Defs.' Response to Pls.' Statement of Facts ¶ 3. There is no question that, before the February 5 Rule, New Yorkers were eligible to apply for TTPs. Now, they are not.

Beyond that, an interpretive rule must actually interpret something, "such as a statute, regulation, or judicial decision." *Wheeler*, No. 18-1172, slip op. at 22. "Interpretive rules"—as the label suggests—"are statements as to what the administrative officer thinks the statute or

regulations means." *Chamber of Commerce v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980) (internal

quotations omitted).  When the agency "does not purport to construe any language in a relevant

statute or regulation; it does not interpret anything" and has instead promulgated a legislative rule.

*Syncor*, 127 F.3d at 95.  Nowhere in the February 5 Rule does the Government cite or quote any

existing statutory or regulatory language.  *See* Pls.' MSJ, Ex. A at 1-3.  The February 5 Rule is

therefore not an interpretive rule.

The Government now claims for the first time that the February 5 Rule interpreted the

governing regulation's "low-risk" traveler requirement, Opp. Br. 17 (citing 8 C.F.R. § 235.12), but

this assertion cannot withstand scrutiny.  The February 5 Rule never once quotes or cites any part

of DHS's existing regulations—not the "low-risk" traveler requirement or any other.  And the

section of the Code of Federal Regulations the Government cites in its Opposition—8 C.F.R.

§ 235.12—creates the Global Entry Program and provides that DHS shall make "*individual*"

determinations as to whether an applicant has any "disqualifying factors" that would render that

person ineligible for participation in the program.  8 C.F.R. § 235.12(b)(2) (emphasis added).  The

regulation sets forth seven "disqualifying factors," including whether "[t]he applicant can[] satisfy

CBP of his or her low-risk status or meet other program requirements."  *Id.* § 235.12(b)(2).  Rather

than interpret this regulatory scheme, the February 5 Rule turns it on its head by precluding DHS

from engaging in any individualized determination at all; under the Rule, no New York applicant

will be allowed to "demonstrate past compliance with laws, regulations, and policies" as 8 C.F.R.

§ 235.12 allows.  *Id.*  No one could regard a categorical termination of eligibility for 20 million

people as merely an "interpretation" or "clarification" of the term "low-risk."  *Cf.* Opp. Br. 17.  For

that to be true, DHS would have had to conclude that the category of "risky" travelers includes

Assistant U.S. Attorneys in the counterterrorism unit of the Southern District of New York, who

hold government-issued Top Secret security clearances, as well as every single CBP, ICE, FBI, and CIA agent in New York.  DHS obviously made no such conclusion, because the February 5 Rule is not an interpretation of the term "low-risk."  *Cf.* Opp. Br. 17.

The Government's remaining arguments on this front are similarly without merit.  The Government relies on its own characterization of its action, emphasizing that it "did not publish the February 5 Letter in the Code of Regulations," and "did not invoke its general legislative authority when announcing the impacts of New York's actions."  Opp. Br. 17.  Although courts consider these two factors, among others, in distinguishing legislative rules from interpretive ones, neither is dispositive; in fact, the D.C. Circuit has held that these two factors are not as "important" as "whether the action has binding effects on private parties or on the agency."  *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002).  Otherwise, an agency could unilaterally immunize its unlawful action simply by keeping it secret or not disclosing its authority.

**C.**     IRTPA independently required DHS to engage in notice-and-comment rulemaking when promulgating eligibility "criteria."  *See* Pls.' Br. 10-11 (citing  8 U.S.C. § 1365b(k)(3)(C)).  Selectively omitting the key statutory phrase "criteria for participation," 8 U.S.C. § 1365b(k)(3)(C), the Government argues that IRTPA does not require notice-and-comment rulemaking here because the cited provision merely required DHS to "initiate a rulemaking to establish … the [Global Entry] program" by December 2008.  Opp. Br. 18.  To be clear, the APA requires notice-and-comment rulemaking here regardless of whether IRTPA also does so.  But the Government is mistaken in any event because an initial deadline does not excuse the agency from following explicitly required procedural steps in future rulemakings derived from the same source of statutory authority.  *See Nat. Res. Def. Council v. Thomas*, 805 F.2d 410, 435-37 & n.39 (D.C. Cir. 1986) (holding that the agency was required to provide industry a four-year lead time before

implementing regulations, as provided by authorizing statute, even though the regulations were promulgated after the statutory deadline because "Congress intended the two requirements"—(1) that regulations be promulgated and (2) that they be promulgated according to certain procedures—"to go hand in hand").  The Government's contrary theory is nonsensical—in its view, it could comply with IRTPA by establishing initial criteria for participation in the program via rulemaking, but could then simply change the criteria at its whim.  IRTPA's rulemaking requirement for "eligibility criteria" would essentially be meaningless under the Government's interpretation.

### III.    The Government Cannot Invoke the APA's Good Cause Exception for the First Time in Court, and No Good Cause Existed in any Event

The Government argues that, "even assuming the February 5 Letter constituted a substantive rule, the Court should still deny Plaintiffs' motion based on the APA's 'good cause' exception."  Opp. Br. 19.  The Court should do no such thing because the Government did not invoke the "good cause" exception in the Rule itself, as the APA requires.

The APA provides a limited exception to notice-and-comment rulemaking for "when the agency for good cause finds (*and incorporates the finding and a brief statement therefor in the rules issued*) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B) (emphasis added); *see also id.* § 553(d) (requiring publication of a substantive rule in the federal register no less than 30 days before its effective date "except … as otherwise provided by the agency for good cause *found and published with the rule*." (emphasis added)).  The Court reviews an agency's finding of good cause *de novo*.  *See United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017).  And in so doing, it "must 'examine closely' the agency's explanation *as outlined in the rule*."  *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 15-16 (D.D.C. 2017) (emphasis added) (quoting *Council of S. Mountains, Inc. v.*

13

*Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981)); *see also Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 665 F.2d 1153, 1156 (D.C. Cir. 1981) (explaining that "the grounds justifying the agency's use of the exception should be incorporated within the published rule"); *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (same).

The Government purports to invoke the APA's "good cause" exception for the first time in this Court.  But as § 553(b)(B) itself and D.C. Circuit precedent make clear, it cannot do so. Nowhere in the February 5 Rule did the Government invoke a good cause exception to notice-and-comment rulemaking or explain its reasons for doing so.  *See* Pls.' Mot. Partial Summ. J., Ex. A at 1-3.  The Government cites no case where a court has excused an agency from following notice-and-comment procedures based on a "good cause" argument made for the first time in a brief. Because the Government failed to make a good cause finding "and incorporate[ ] the finding and brief statement therefor" in the February 5 Rule, 5 U.S.C. § 553(b)(B), it cannot rely on that exception now.

Even if the Government could validly invoke the APA's "good cause" exception for the first time in this Court, its attempt to do so here would fail.  The D.C. Circuit has "said that the 'good cause' exception … is to be narrowly construed and only reluctantly countenanced." *Ross*, 848 F.3d at 1132.  "[C]ircumstances justifying reliance on this exception are indeed rare and will be accepted only after the court has examined closely proffered rationales justifying the elimination of public procedures." *Council of S. Mountains*, 653 F.2d at 580 (internal quotations omitted).  This exception is not an "escape clause "that may be arbitrarily utilized at the agency's

whim.  Rather, use of these exceptions should be limited to emergency situations."  *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).[1]

The Government cannot establish good cause because the February 5 Rule itself shows that DHS had ample time to promulgate a rule in accordance with notice-and-comment procedures. The Rule explains in its opening sentence that New York enacted the Driver's License Access and Privacy Act on June 17, 2019—that is, nearly 8 *months* before DHS issued the February 5 Rule. *See* Pls.' Mot. Summ. J, Ex. A at 1.  DHS could have initiated notice-and-comment rulemaking during that 8-month span to solicit comments from the public about how to address the effect of New York's law on TTPs.  DHS did not do that.  An agency may not invoke the "good cause" exception where the supposed "emergency" creating the need for the exception is of the agency's own making.  The Government's argument that the law created an "emergency" situation requiring the agency to forgo notice and comment is especially unpersuasive when one considers that the February 5 Rule also notes that the law went into effect on December 14, 2019—nearly 2 months before DHS issued its rule.  The Government's claim that the law created an emergency rings hollow where, as here, DHS waited nearly 8 months after passage of the law and 2 months after the effective date to act.

The Government suggests that notice-and-comment would have been impracticable and contrary to the public interest because New York's Green Light Law necessitated an

---

[1] The Government is not entitled to any "deference" with respect to its good cause arguments.  *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) ("Deference to an agency's invocation of good cause—particularly when its reasoning is potentially capricious, as is the case here—would conflict with this court's deliberate and careful treatment of the exception in the past. Therefore, our review of the agency's legal conclusion of good cause is *de novo*.").  Moreover, the agency made no "factual findings" or "expert judgments" in the February 5 Rule with respect to good cause because it did not invoke the good cause exception.  *Cf.* Opp. Br. 20.  Arguments by a government lawyer in a brief, and made-for-litigation *ex parte* declarations by agency officials, are not agency findings that merit deference.

"immediate[ ]" and categorical ban on New Yorkers to "ensure[ ] that only individuals who present a low risk are approved for membership and that membership is not abused by individuals engaged in criminal activity and attempting to evade detection by CBP officers."  Opp. Br. 20.  This explanation makes little sense.  In the absence of the February 5 Rule, DHS would not have been required to *approve* the application of a single individual New Yorker as to whom it had any risk concern.  It is not as if delaying the Rule for notice and comment would have left the agency powerless to prevent criminals from gaining access to Global Entry.

Moreover, logical flaws in the February 5 Rule further belie the Government's made-for-litigation claim that the inability to access DMV records somehow constitutes an "emergency." DHS did not cancel existing Global Entry memberships for New Yorkers even though it is unable to access updated DMV records for those individuals.  And DHS continues to accept, process, and approve applications from the millions of *former* New Yorkers who currently live in other states. Like current New Yorkers who are now banned under the February 5 Rule, these former New York residents may have records with New York's DMV.  But DHS continues to process and approve applications from them even though their applications contain the same sort of "incomplete information" that purportedly justified an immediate categorical ban.  *Id.* at 21.  Likewise, DHS continues to process and approve applications from residents of Connecticut and New Jersey who drive in New York every day and whose records may be contained in New York's DMV.  The Government's assertion of "good cause" simply cannot withstand the "close scrutiny" that the law requires.  *Council of S. Mountains*, 653 F.2d at 580.

The Government also offers the remarkable claim that notice-and-comment would have been "contrary to the public interest" because it "would have made no difference" in the Government's decision-making process.  Opp. Br. 21.  But "[b]ald assertions that the agency does

not believe comments would be useful cannot create good cause to forgo notice and comment procedures." *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 800 (D.C. Cir. 1983).  Again, the Government's insistence that public comments would not have changed the Rule is belied by the myriad logical fallacies in the Rule itself and is evidence that the agency violated the substantive provisions of the APA by acting with an "unalterably closed mind."  *Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

## IV.   The Government's Failure to Engage in Notice-And-Comment Rulemaking Was Not Harmless

The Government's final argument is that the Court should not vacate the February 5 Rule because any procedural error was harmless.  Opp. Br. 21-22.  But it is black-letter law that a complete failure to engage in notice-and-comment rulemaking is not harmless error.  As the D.C. Circuit just recently reiterated:

> [T]he entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures.  For that reason, we have 'not been hospitable to government claims of harmless error in cases in which the government … fail[ed] to provide notice.'  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014).  And we have found cases 'in which a government agency seeks to promulgate a rule by another name—evading altogether the notice and comment requirements—to be the most egregious breaches of notice-and-comment obligations.  *Id.*

*Wheeler*, No. 18-1172, slip op. at 25.  Put another way, "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure."  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 335 (D.C. Cir. 2017); *see also Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003) (same); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) (same).  The APA's rulemaking requirements "obviously would be eviscerated" under a contrary principle.  *Safari Club*, 878 F.3d at 335 (quoting *Sugar Cane Growers*, 289 F.3d at 96).

17

The Government must show beyond a shadow of a doubt that notice-and-comment rulemaking would not have changed the outcome.  But all it offers are bald assertions.  *See* Opp. Br. 21-22.  That is not enough. And the Government's position, if accepted by the Court, would "virtually repeal section 553's requirements."  *Safari Club*, 878 F.3d at 335.  It is quite clear, after all, that public comments from interested parties should and likely would have compelled changes to the February 5 Rule in light of the Rule's self-evident logical deficiencies. *See supra* p. 16.  The public could have pointed out many of the deficiencies discussed above, including the fact that the Rule does not apply to the many former residents of New York whose applications similarly contain "incomplete information" under the Government's theory.  Public commenters might have also asked why the agency could not have obtained the information it seeks from other sources like the FBI's database on criminal convictions, or why a categorical ban on New Yorkers is appropriate given that citizens of eleven foreign countries along with Mexican nationals (whether citizens or not) are still eligible to at least apply for these programs.  Pls.' Br. 11-12.  Because there is ample "uncertainty … as to the effect of [the agency's] failure" to engage in notice-and-comment rulemaking, its failure to do so was not harmless.  *Safari Club*, 878 F.3d at 335.

The Government's claim that notice-and-comment rulemaking would not have "affect[ed] the outcome" of its decision, Opp. Br. 21-22, is not credible in light of these obvious logical flaws. But accepting the Government's assertion would merely postpone the inevitable vacatur of the Rule.  If the Court holds that the agency's failure to engage in notice-and-comment rulemaking was harmless because the agency now says that *no possible comment* could have affected its decision, that is a holding that the relevant decisionmaker "act[ed] with an 'unalterably closed mind' and [was] 'unwilling or unable' to rationally consider arguments" against its initial position. *Air Transport Ass'n*, 663 F.3d at 487).   And such a holding would provide an independent

justification for vacatur.  *See id.*  DHS here exhibited precisely the sort of unaccountable, untransparent, and irrational decision-making that Congress tasked the courts with restraining when it enacted the APA.  *See Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 88 (D.C. Cir. 2014) (Kavanaugh, J.).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial summary Judgment on Count I, declare that the February 5 Rule is unlawful because it was "without observance of procedure required by law," and vacate the February 5 Rule.

Dated:  April 9, 2020                              Respectfully submitted,

                                                   ARNOLD & PORTER
                                                       KAYE SCHOLER LLP

                                                   /s/ Elisabeth S. Theodore
                                                   Elisabeth S. Theodore (D.C. Bar No. 1021029)
                                                   R. Stanton Jones (D.C. Bar No. 987088)
                                                   Andrew T. Tutt (D.C. Bar No. 1026916)
                                                   Stephen K. Wirth (D.C. Bar No. 1034038)
                                                   Graham W. White (D.C. Bar No. 888273658)
                                                   Janine M. Lopez* (*pro hac vice*)
                                                   ARNOLD & PORTER
                                                       KAYE SCHOLER LLP
                                                   601 Massachusetts Ave., NW
                                                   Washington, DC 20001
                                                   (202) 942-5000
                                                   (202) 942-5999 (fax)
                                                   elisabeth.theodore@arnoldporter.com
                                                   stanton.jones@arnoldporter.com
                                                   andrew.tutt@arnoldporter.com
                                                   stephen.wirth@arnoldporter.com
                                                   graham.white@arnoldporter.com
                                                   janine.lopez@arnoldporter.com

                                                   *Counsel for Plaintiffs*

                                                   *Admitted to practice only in Massachusetts;
                                                   practicing law in the District of Columbia during

the pendency of her application for admission to the
D.C. Bar and under the supervision of lawyers of
the firm who are members in good standing of the
D.C. Bar